**[Cite as *In re Kister*, 194 Ohio App.3d 270, 2011-Ohio-2678.]**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| IN RE KISTER, | : | CASE NO. 10CA19 |
| Appellant. | : | |
| | : | DECISION AND JUDGMENT ENTRY |

APPEARANCES:

Chad Kister, pro se.

Susan Gwinn, for appellee.

CIVIL APPEAL FROM COMMON PLEAS COURT, PROBATE DIVISION
DATE JOURNALIZED:   5-26-11

PER CURIAM.

{¶ 1}   This is an appeal from an Athens County Common Pleas Court, Probate Division, judgment that involuntarily committed Chad Kister, respondent below and appellant herein, to 90 days in a state mental institution.   Appellant raises 25 identical assignments of error that state:

The trial court erred in committing author and film maker Chad Kister to 90 days in a mental institution.

{¶ 2}   Although appellant's 25 assignments of error are identical, appellant presents 25 ostensibly different "issues for review and argument," that we will attempt to construe as individual assignments of error:

FIRST ISSUE

The pink slip was based on false information, such as an allegation that Kister had not been eating when he had been eating for a week, and false

allegations that he had been increasingly agitated toward police, when in fact he had worked with police to prosecute a criminal for menacing in 2009, and had filed three successful lawsuits against police proving that it is they who intimidate, assault, brutalize and horrifically violate Kister's rights, and that Kister is professional, calm and completely peaceful and nonviolent when communicating with police.

### SECOND ISSUE

Attorney Richard Hedges failed to allow Kister to explore issues of conflict of interest.

### THIRD ISSUE

The Probate Court and Psychiatrist Dr. Anthony Derrico failed to take into account the long history of police attacks against Kister, as documented with his three successful lawsuits against police.  Because complaints by local law enforcement provided the impetus for locking Kister in ABH [Appalachian Behavioral Healthcare], Dr. Derrico's lack of any knowledge about Kister's three successful lawsuits against police shows a blatant lack of credibility by Dr. Derrico.

### FOURTH ISSUE

Kister's x-rays and the exhibits submitted during the May 6, 2010 trial clearly show that it is other doctors that have said Kister has a brain implant, and it is not coming from Kister.  Thus, to accuse Kister of being mentally ill because he asks others to look at the writings of doctors and other experts who have diagnosed him and others with brain implants, is a flagrant violation of Kister's First Amendment Rights.  Kister was looking out for his health and safety, particularly because some doctors warn that his x-rays show that he has brain cancer.

### FIFTH ISSUE

The transcript is full of errors that need corrected.

### SIXTH ISSUE

Because Kister received his Master's of Science Degree at Ohio University a few weeks prior to being pink slipped and committed, arguments that Kister is mentally ill are fundamentally disproven.

### SEVENTH ISSUE

The limit of 15 minutes of questioning and arguments is arbitrary and capricious and woefully inadequate for a rubber stamped commitment that completely destroys Kister's career for all time.

EIGHTH ISSUE

Kister should have been granted his request for a jury trial, which is a fundamental tenant [sic] of American Democracy.

NINTH ISSUE

Magistrate Jonathan Perrin violated Kister's 5th Amendment Right against self incrimination.

TENTH ISSUE

Jonathan Perrin refused to allow Kister's three Ph.D. character witnesses to testify. This was critical for Kister's right to a fair trial, and they were sitting, waiting in the same in the lobby [sic] of the building whether the court hearing was held (ABH) but they were not allowed to testify.

ELEVENTH ISSUE

Kister was denied the right to a fair trial. He was unable to get adequate internet time to research for his case [sic], and he was not allowed access to a law library.

TWELFTH ISSUE

Athens County Sheriff Deputies are the ones who threatened Kister, by pointing guns at him and kicking in his door. Kister does not own a gun and was in no way shape or form responsible for police assaulting his liberties and threatening his life with a gun. Thus, the arguments to the contrary are negated.

THIRTEENTH ISSUE

ABH violated Kister's 8th Amendment Right against cruel and unusual punishment by denying the only glaucoma medication that Kister is not allergic to. Kister was in the process of going blind and had a severe headache because he lacked his preferred herbal treatment for pain, white willow. This massively violated Kister's right to a fair trial.

## FOURTEENTH ISSUE

Kister's 14th Amendment Rights were violated because he has been persecuted as a targeted individual who has successfully sued three police agencies who are now acting in retaliation, in violation of Kister's right to equal protection under the law.

## FIFTEENTH ISSUE

The commitment decision violated Kister's 5th Amendment Rights of taking Kister's property without due process, such as a jury trial. Because the incarceration caused a massive financial loss to Kister, hitting him at the same time he had opened his new business, it was exceptionally hard-hitting.

## SIXTEENTH ISSUE

Because it was doctors and others who said that Kister has a brain implant (and some said a brain tumor as well), and Kister was merely citing them as confirmation in his press release and conversations, arguments that Kister was delusional are null and void. It is not Kister who came to the conclusion that he [w]as given a brain implant against his will[;] it is the conclusion of numerous doctors and others, whose statements have been submitted to the record as exhibits (and Kister requests that all exhibits be transferred to the appeals court record).

## SEVENTEENTH ISSUE

Dr. Anthony Derrico claimted [sic] tat [sic] Kister was paranoid, but he denied knowledge that Kister had filed three successful lawsuits against police, and that a local criminal had recently been convicted of threatening to kill him three times.

## EIGHTEENTH ISSUE

Arguments that Kister was spiraling out of control in the last 14 months are null and void because during that time Kister completed his 4th book, which is now being reviewed by Seven Stories Press, Received his Masters of Science Degree at Ohio University with a 3.5 GPA, and initiated and passed a wellhead protection for the water supply of Nelsonville.

## NINETEENTH ISSUE

Arguments that Kister was a threat to himself because [he] had been on a fast are null and void because Kister had been eating for a week, wants to live to be

more than 140 years old, and has displayed a continued concern for his health and well-being that ABH harmed.

TWENTIETH ISSUE

Kister is working on litigation against members of his family, making communications from them null and void as an argument for committal because they are acting in retaliation.

TWENTY-FIRST ISSUE

Evidence used against Kister was taken in violation of his 4th Amendment rights because he refused to allow doctors to take blood or urine.

TWENTY-SECOND ISSUE

Claims that Kister mumbled to himself cannot be found in the ABH record. Dr. Derrico slandered Kister, and is acting on misinformation.

TWENTY-THIRD ISSUE

ABH was a threat to Kister's health by refusing to treat his hernia and glaucoma, refused to provide him enough food and used toxic cleaners.

TWENTY-FOURTH ISSUE

Dr. Derrico claimed * * * Kister was involved in fringe movements in his diagnosis, but denied it during the May 6, 2010 trial, questioning his credibility.

TWENTY-FIFTH ISSUE

Because a press release in Kister's website was used as a primary reason for Kister's commitment, the commitment violated Kister's First Amendment Right to freedom of the press. Also, Kister is a journalism graduate with the Scripps School of Journalism at Ohio University.

{¶ 3}  On April 27, 2010, Dr. Anthony Derrico filed an R.C. 5122.11 affidavit of mental illness in which he alleged that appellant is mentally ill and that he represents a substantial risk of physical harm to himself as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm.  Dr. Derrico attested to the following facts:

Mr. Kister is a 39-year-old single white male from Buchtel, Ohio admitted on 04/22/10 on an involuntary status after being prescreened by Tri-County Mental Health ["TCMH"] and medically cleared by O'Bleness Memorial Hospital. He presents for his first inpatient psychiatric hospitalization. Information from the prescreener, the application for emergency admission, the patient's own website * * * and from his mother Joanna Kister * * * comments that for at least the past 14 months, Mr. Kister has been expressing persecutory delusions that the federal government has used nanotechnology to place an implant in his brain. He has gone to great lengths in an attempt to prove that this has happened. He has had at least three series of brain imaging completed. On 04/02/10, he began a hunger strike. He wanted the US government to admit that they put in a brain implant and that they were engaging in thought torture. On his website, he commented "the lack of significant coverage by the media about brain computer interface technology and nanotechnology has allowed for covert means of monitoring and harassment that go unnoticed. The Defense Advanced Research Project Agency has been spending billions of dollars on brain implant technology, but the general accounting office has only spent a few percent of the money that was supposed to go for safeguarding the abuse of this technology." He goes on to state "I implore citizens to undertake an investigation, and begin a campaign to expose this before I die of brain cancer or starvation. The perpetrators of this terrorist act have used their knowledge of my whereabouts to poison and assault me, and intimidate me constantly." His mother states that over the last year, he has grown increasingly paranoid. He has placed cameras in his house. He has complained numerous times to his local police department that others are coming into his house questioning him and harassing him about the brain implant. In fact, the police department has contacted local community mental health complaining that his behaviors are becoming increasingly erratic. His mother too is quite concerned. She has called TCMH from Florida at least five separate times voicing her concern for her son. She is very worried about his mental status. [TCMH] ultimately did go out to interview him. This was conducted by Chris Henry. He apparently was asked to leave Mr. Kister's home. At some point, Sheriff's Officers showed up. Mr. Kister locked all the doors and would not come out. Sheriff's Department had to kick down the door with guns drawn to get to Mr. Kister. Mr. Kister states that he continued his hunger strike for 14 days. He is concerned that the implant may have the ability to transmit information from his own brain to a computer interface, so that others could evaluate what he is thinking, seeing, and feeling. He states that this would be the ultimate infringement [of] his constitutional rights. When queried on auditory hallucinations, he became very defensive and would not answer the question. In his writings on the Internet, he commented that another person with an implant was suffering from hearing two separate voices. It is quite likely that he is referring to himself. He has been e-mailing his parents asking for large sums of money, so that he can go to Canada and have further testing done feeling that his diagnosis has not been correct. In fact he went to Windsor,

Canada in August of 2009 where he apparently did have brain imaging completed; however, he never got the results. His mother has noted a significant decline in his social functioning over the last one to one-and-a-half years and possibly longer. Mr. Kister does have a significant disorder of thought (Schizophrenia, Paranoid Type) that is impairing his judgment, behavior, and ability to recognize reality. His mental illness places him at risk to self as evidenced by his recent hunger strike in the community and now at this facility. His behaviors with local sheriff's officers have also placed his welfare at significant risk. We are asking the court to consider involuntary hospitalization to address his significant psychiatric needs. The hospital setting remains the least restrictive environment.

{¶ 4} On April 28, 2010, the court appointed attorney Kenneth Ryan to represent appellant and set the matter for an April 29, 2010 hearing. On April 29, 2010, appellant's attorney waived the initial hearing. The court then (1) set the matter for a full hearing to be held on May 6, 2010, (2) permitted attorney Ryan to withdraw, and (3) appointed attorney Richard Hedges to represent appellant.

{¶ 5} Also, on April 29, 2010, the magistrate noted that appellant attempted to file pro se documents. The magistrate observed, however, that appellant has an attorney and directed the clerk to place the pro se filings under seal and to not accept the pro se documents for filing. The magistrate also observed that Hedges advised the court that appellant wished to terminate Hedges, but Hedges did not request the court to allow him to withdraw. A deputy probate clerk advised the court that appellant had telephoned the clerk's office and alleged that Hedges has a conflict of interest. The magistrate directed Hedges "to review and consider [appellant]'s allegations of a conflict and report to the Court, with all due haste, whether he believes said conflict exists. [Appellant]'s simply not wanting attorney Hedges to represent him shall not be construed as a conflict justifying termination of representation."

{¶ 6} On May 6, 2010, the magistrate held a hearing. The magistrate initially noted

appellant's concern regarding Hedges's representation.   The court explained "three situations" in which it would consider removing Hedges from representation: (1) if appellant could demonstrate that he has the ability to hire his own attorney, (2) if Hedges has a conflict of interest, and (3) if appellant waived his right to counsel.   Appellant stated that he did not have the means to hire his own attorney.   Hedges also advised the magistrate in open court that he did not have a conflict of interest.   The magistrate asked appellant if he believed that Hedges had a conflict of interest that would prohibit Hedges from effectively representing appellant.   Appellant responded that he had "not had the opportunity to explore who his clientele is outside of ABH so I do not know at this time."   At this juncture, the court found no basis for the alleged conflict of interest.

{¶ 7}   Appellant also stated that he wished to act as the lead counsel in his case and to have Hedges assist him.   The magistrate, instead, directed Hedges to conduct the primary witness examination and to then allow appellant to ask any additional questions of the witnesses.

{¶ 8}   Hedges further informed the court that appellant wanted the case transferred to federal court.   The magistrate stated that he had no authority to transfer the case to federal court and that an involuntary-commitment proceeding is a state matter.   Appellant then advised the magistrate that he wanted a jury trial, but the magistrate stated that no provision for a jury trial exists in an R.C. Chapter 5122 involuntary-commitment proceeding.

{¶ 9}   At the hearing, Dr. Derrico testified that he examined appellant on April 23, 26, and 27 and May 5, 2010.   He opined that appellant suffers from "a substantial disorder of thoughts, schizophrenia paranoid type."   Dr. Derrico explained that he reviewed some information that appellant had posted on appellant's website and requested the court to review it. Appellant's counsel objected to the material as unauthenticated.   The magistrate asked appellant

whether he authored the material and whether he would mind if the magistrate considered it. When the court asked appellant if he authored the material, appellant stated: "I plead the Fifth." Hedges repeated his objection to the material as evidence. The magistrate did not allow the material to be entered as evidence but did allow the doctor to testify regarding his review of the website material.

{¶ 10} Dr. Derrico continued his testimony and further explained that appellant believed that in March 2009, the government had given him a brain implant. Appellant continued in this belief and in April 2010, he began a hunger strike and stated that he would continue with the hunger strike until the government admitted that it placed an implant in his brain. Appellant stated that he feared that the "implant is interfacing with computers and that his thoughts, his feelings, and his emotions, can be picked up by computers and then read by agencies [and the federal government]" Dr. Derrico stated that "obviously these are meeting the realm of bizarre delusions." Dr. Derrico also stated that appellant had three series of brain imaging and none showed any abnormal object placed in his brain. Dr. Derrico further testified that appellant refused proper medical treatment for glaucoma but instead desired medical marijuana for treatment.

{¶ 11} Dr. Derrico stated that he talked to appellant about his hunger strike and explained their conversation as follows:

> [Appellant] believed that approximately one year ago, March 27, 2009 specifically, that he was assaulted by some folks and that he woke up with a scar and since then he thought he had a[n] implant placed in the front of his brain, and that nano technology was used for this implant. He feels like the government was behind all of this and he in fact started roughly a year later, * * * to continue having this belief and started a hunger strike at his home. Specifically stating that he's going to do the hunger strike until the US Government admits that it had put

in the brain implant and engaging in self-torture. * * * What he is * * * concerned about is that the microchip implant is interfacing with computers and that his thoughts, his feelings, and his emotions, can be picked up by computers and then read by agencies, federal government * * * and cause him to have infringements in his legal rights. Obviously these are meeting the realm of bizarre delusions. * * * this started with some of his writings going all the way back to February of '09 when he started talking about some other people having such implants. He then stated that he knew of a respected scholar in Athens, he often talks in the third person on his website, from Athens, Ohio. He continues to try to get his doctors to admit there is an object in his frontal lobe pointing to it on x-rays. His doctors have been given national security letters and they all say that everything looks normal. You can see the x-ray compared to an x-ray of the brain without a microchip and clearly see the difference. I think there's obviously no difference. He has gone to great lengths to try to prove that he has this microchip. He's had three series of brain imaging done. We have reports from O'Bleness. We have reports from Gallipolis, MRI, there is not microchip. His brain is normal. There is nothing going on. Yet he goes and tries to seek * * * confirmation that there is this micro chip in his brain * * *. He has filed numerous complaints with Nelsonville Police. They have gotten nervous to the point that they actually called Tri-County Mental Health. His mother, a PhD in Florida, has called Tri-County Mental Health at least five sets of times with her concerns about his behaviors over the last year. He's gone on a hunger strike for 14 days. He's gone on a hunger strike in our hospital for about six days. Again, protesting and wanting the government to admit that they are behind all of this torture, thought torture through this implant. * * * When * * * Tri-County Mental Health went out to evaluate him, he kicked the evaluator out of the home. The pre-screener called Nelsonville Police and he locked everybody out. They had to kick the door down with guns drawn to get him out, obviously facing a risk again.

Dr. Derrico testified that he believed appellant represents a substantial risk of harm due to his hunger strikes. He further explained that appellant went from a week-long hunger strike at the hospital to a request for a 9,000- calorie-per-day diet.

{¶ 12} Appellant testified that he is preparing for an Arctic expedition and to do so, he has been following a restrictive diet that often includes periods of minimal food intake. He explained:

> Fasting is very healthy. I am an Eagle Scout and my motto is be prepared and so in order to prepare for these expedition[s] I often go a week or two with

minimal food just drinking juices and very healthy * * * . Then I eat an enormous amount often at the Chinese buffet to fit my budget and my body has adjusted to that. So, when I go through long stretches in the wilderness with a native American guide we have very little food. A native American might take a caribou or moose or I might catch a giant fish. We have to eat enormous amounts because carrying meat is very dangerous with grizzly bears and polar bears and also one food drop would have cost more than my entire arctic expedition.

{¶ 13} Appellant stated that he would never hurt himself and that he "want[s] to live to be more than 140 years old." He stated:

> I am a very sane and competent person. I do exercise my First Amendment rights and perhaps at times like a poker player bluff a fast, being a hunger strike as a means to get political, to help to be powerful politically. I would never kill myself. I ended this previous hunger strike because I was concerned about my health and I got a lot of people in the community to look into this and had an article in the paper last Thursday in the Athens News. It was successful. I would never hurt myself. The British Empire did not arrest Ghandi when he engaged in a hunger strike that ended some of the greatest blood shed * * * in the world when Pakistan broke away from India. The British Empire did not arrest and incarcerate Ghandi when he engaged in two 21 day[] fasts drinking only water and a little bit of lemon and that was very successful * * * .

{¶ 14} The court interrupted appellant to inquire whether his hunger strikes were as politically motivated as Ghandi's or whether they were related to his belief that the government had implanted a chip in his brain. Appellant stated:

> When I had my x-rays compared to another x-ray [there is] an abnormality in my frontal lobe that has been documented and not by me, but by the FDA, Paul Hardy with the FDA, as submitted as evidence. He showed [it] to a radiologist, Dr. Smith, who found, "an expansible mass" which could be a malignant tumor. Dr. Elizabeth [DeLong] who treated me one of many times when I spoke in Ithaca, New York, she said that I have a brain implant-tumor in writing and that's coming from her. Dr. Wu, from Nelsonville Doctor's Hospital said, "I need to see a neurosurgeon." Dr. Debaju a neurologist in Nelsonville said that I should have been told about this. And other people when they look at my x-rays have said, yeah, that's obviously, you know, that doesn't look normal. And I have done an enormous amount of research to show that there actually is brain computer interface and brain implant technology. * * * So, I'm not saying whether or not I do have a brain implant or not. It is not an issue. It may be a technique I'm using

to get the world to look into this technology.

{¶ 15} During Gwinn's cross-examination of appellant he admitted to writing the material dated April 7, 2010, in which he states: "Chad Kister began a hunger strike on April 2 until the US Government admits that it has put a brain implant and are engaging in thought torture."  He stated that he was not necessarily agreeing that he believes he has a brain implant, but explained that maybe he stated that he does to raise awareness of the issue.  Appellant stated that he had been on a hunger strike for 14 days.  He claimed he was cooking a veggie burger when the sheriff came to his house.  Appellant further testified that he would never hurt himself and that he uses hunger strikes as a means of protest.

{¶ 16} On May 7, 2010, the magistrate found, by clear and convincing evidence, that appellant is a mentally ill person who is subject to hospitalization by court order as defined in R.C. 5122.01(B)(1) and (4).  The magistrate recommended that appellant be ordered to spend not more than 90 days committed to the Athens County Mental Health Board.  That same day, the trial court adopted the magistrate's decision.

I

PRO SE LITIGANTS

{¶ 17} Before we begin our analysis, we observe that appellant is acting pro se in this appeal.  Because we ordinarily prefer to review a case on its merits rather than dismiss it due to minor procedural technicalities, we have adopted a policy of affording considerable leniency to pro se litigants.  See, e.g., *In re Estate of Pallay*, Washington App. No. 05CA45, 2006-Ohio-3528, ¶ 10; *Robb v. Smallwood*, Meigs App. No. 05CA4, 2005-Ohio-5863, ¶ 5. *Besser v. Griffey* (1993), 88 Ohio App.3d 379, 382, 623 N.E.2d 1326; *State ex rel. Karmasu v. Tate*

(1992), 83 Ohio App.3d 199, 206, 614 N.E.2d 827.  "Limits do exist, however.  Leniency does not mean that we are required 'to find substance where none exists, to advance an argument for a pro se litigant or to address issues not properly raised.'"  *State v. Headlee*, Washington App. No. 08CA6, 2009-Ohio-873, ¶ 6, quoting *State v. Nayar*, Lawrence App. No. 07CA6, 2007-Ohio-6092, ¶ 28.  Furthermore, we will not "conjure up questions never squarely asked or construct full-blown claims from convoluted reasoning." *Karmasu* at 206.  In other words, pro se litigants are "required to submit a brief that contains at least some cognizable assignment of error."  *Robb* at ¶ 5.  We thus consider appellant's 25 issues and arguments presented for review to the extent that they contain cognizable assignments of error.

## II

## MANIFEST WEIGHT OF THE EVIDENCE

**{¶ 18}** Appellant's primary argument appears to be that clear and convincing evidence does not support the trial court's finding that he is mentally ill and subject to involuntary-commitment and, thus, that the court's judgment is against the manifest weight of the evidence.

## A

## FAILURE TO OBJECT TO THE MAGISTRATE'S DECISION

**{¶ 19}** Initially, we note that appellant did not object to the magistrate's decision. Generally, a party waives the right to challenge a trial court's adoption of a magistrate's decision unless that party objects to the magistrate's decision in accordance with Civ.R. 53(D)(3).  See Civ.R. 53(D)(3)(b)(iv).  Under Civ.R. 53(D)(3), a party must file objections to a magistrate's decision within 14 days of the decision.  See Civ.R. 53(D)(3)(b)(I).  Moreover, "[a]n objection

to a magistrate's decision shall be specific and state with particularity all grounds for objection." Civ.R. 53(D)(3)(b)(ii). Additionally, a party must support the objections with "a transcript of all the evidence submitted to the magistrate relevant to that finding or an affidavit of that evidence if a transcript is not available." Civ.R. 53(D)(3)(b)(iii). " 'In essence, the rule is based on the principle that a trial court should have a chance to correct or avoid a mistake before its decision is subject to scrutiny by a reviewing court.' " *Barnett v. Barnett*, Highland App. No. 04CA13, 2008-Ohio-3415, ¶ 16, quoting *Cunningham v. Cunningham*, Scioto App.01 CA2810, 2002-Ohio-4094, ¶ 8. If a party fails to comply with any of the provisions in Civ.R. 53(D)(3)(b), then "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law."[1]

**{¶ 20}** In the case at bar, appellant did not object to the magistrate's decision. Thus, appellant has waived all but plain error. However, courts should exercise extreme caution when invoking the plain-error doctrine, especially in civil cases. Consequently, courts should limit applying the doctrine to cases "involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public

---

[1] The Rules of Civil Procedure apply in an involuntary-commitment proceeding to the extent they are not inconsistent with the involuntary-commitment statutes. See R.C. 5122.15(A)(15). Civ.R. 52 does not appear to conflict with the involuntary-commitment statutes. In fact, R.C. 5122.15(J) appears to correlate with Civ.R. 52. R.C. 5122.15(J) states:

Within fourteen days of the making of an order by a referee, a party may file written objections to the order with the court. The filed objections shall be considered a motion, shall be specific, and shall state their grounds with particularity. Within ten days of the filing of the objections, a judge of the court shall hold a hearing on the objections and may hear and consider any testimony or other evidence relating to the respondent's mental condition. At the conclusion of the hearing, the judge may ratify, rescind, or modify the referee's order.

reputation of the judicial process."  *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 122-123, 679 N.E.2d 1099; see also *In re Alyssa C.m* 153 Ohio App.3d 10, 2003-Ohio-2673, 790 N.E.2d 803, ¶ 35; *In re Curry*, Washington App. No. 03CA51, 2004-Ohio-750.  We do not find plain error in the case sub judice.

B

STANDARD OF REVIEW

**{¶ 21}** It is well established that under the manifest-weight-of-the-evidence standard of review, an appellate court must uphold a trial court's judgment if some competent, credible evidence going to all the essential elements of the case supports that judgment.  See, e.g., *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus ("Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence"); *In re K.W.,* Franklin App. No. 06AP-731, 2006-Ohio-4908, ¶ 6 (stating that an appellate court will not reverse a finding that a person is a mentally ill person subject to hospitalization under R.C. 5122.01 as against the manifest weight of the evidence if it is supported by some competent, credible evidence going to all the essential elements of the case). "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct."  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81, 10 OBR 408, 461 N.E.2d 1273.  Thus, issues that relate to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.  As the court explained in *Seasons Coal* at 80:  "The underlying rationale of giving deference to

the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." See also *Wilson.* "'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.'" *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, quoting *State v. Konya*, Montgomery App. No. 21434, 2006-Ohio-6312, ¶ 6, quoting *State v. Lawson* (Aug. 22, 1997), 2d Dist. No. 16288. Thus, "'[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" *Wilson* at ¶ 24, quoting *Seasons Coal* at 81.

{¶ 22} We further note that a trial court may not involuntarily commit an individual unless it finds clear and convincing evidence to support such commitment. See R.C. 5122.15(C). Clear and convincing evidence is evidence that "will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. The clear-and-convincing standard requires a higher degree of proof than "a preponderance of the evidence," but less than "evidence beyond a reasonable doubt." *State v. Ingram* (1992), 82 Ohio App.3d 341, 346, 612 N.E.2d 454. *State v. Wilson.* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 20. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54 ("Where the proof required must be clear and convincing, a reviewing court will examine the record to

determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof").

C

INVOLUNTARY-COMMITMENT PROCEEDINGS

{¶ 23} The involuntary commitment of an individual constitutes a significant deprivation of liberty. See *Addington v. Texas* (1979), 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323; *In re Miller* (1992), 63 Ohio St.3d 99, 101, 585 N.E.2d 396. Thus, "it is particularly important that the statutory scheme be followed so that the [individual's] due-process rights receive adequate protection." *Miller* at 101. In applying the statutory scheme, "the individual's right against involuntary confinement depriving him or her of liberty must be balanced against the state's interest in committing those who are mentally ill" and who pose a continuing risk to society or to themselves. Id.

{¶ 24} R.C. Chapter 5122 sets forth the statutory scheme that a trial court must follow to protect an individual's due-process rights in an involuntary-commitment proceeding. See *Miller*. As relevant here, R.C. 5122.11 provides:

> Proceedings for the hospitalization of a person pursuant to sections 5122.11 to 5122.15 of the Revised Code shall be commenced by the filing of an affidavit in the manner and form prescribed by the department of mental health, by any person or persons with the court, either on reliable information or actual knowledge, whichever is determined to be proper by the court. This section does not apply to the hospitalization of a person pursuant to section 2945.39, 2945.40, 2945.401, or 2945.402 of the Revised Code.
> The affidavit shall contain an allegation setting forth the specific category or categories under division (B) of section 5122.01 of the Revised Code upon which the jurisdiction of the court is based and a statement of alleged facts sufficient to indicate probable cause to believe that the person is a mentally ill person subject to hospitalization by court order. The affidavit may be accompanied, or the court may require that the affidavit be accompanied, by a

certificate of a psychiatrist, or a certificate signed by a licensed clinical psychologist and a certificate signed by a licensed physician stating that the person who issued the certificate has examined the person and is of the opinion that the person is a mentally ill person subject to hospitalization by court order, or shall be accompanied by a written statement by the applicant, under oath, that the person has refused to submit to an examination by a psychiatrist, or by a licensed clinical psychologist and licensed physician.

Upon receipt of the affidavit, if a judge of the court or a referee who is an attorney at law appointed by the court has probable cause to believe that the person named in the affidavit is a mentally ill person subject to hospitalization by court order, the judge or referee may issue a temporary order of detention ordering any health or police officer or sheriff to take into custody and transport the person to a hospital or other place designated in section 5122.17 of the Revised Code, or may set the matter for further hearing.

The person may be observed and treated until the hearing provided for in section 5122.141 of the Revised Code. If no such hearing is held, the person may be observed and treated until the hearing provided for in section 5122.15 of the Revised Code.

{¶ 25} Once a court receives an R.C. 5122.11 affidavit, R.C. 5122.13 requires the court to refer the affidavit "to the board of alcohol, drug addiction, and mental health services or an agency the board designates to assist the court in determining whether the respondent is subject to hospitalization and whether alternative services are available, unless the agency or board has already performed such screening." The statute then requires the person who performed the investigation to "make a report to the court, in writing, in open court or in chambers, as directed by the court and a full record of the report shall be made by the court."

{¶ 26} The trial court must hold a hearing "to determine whether or not the respondent is a mentally ill person subject to hospitalization by court order." R.C. 5122.141. The hearing must "be conducted in a manner consistent with this chapter and with due process of law." R.C. 5122.15(A). R.C. 5122.15 further prescribes the various rights to which the respondent is entitled during the proceeding. At the conclusion of the hearing, the court may involuntarily

commit the respondent if it "finds by clear and convincing evidence that the respondent is a mentally ill person subject to hospitalization by court order."   R.C. 5122.15(C).

{¶ 27} R.C. 5122.01 defines when a mentally ill person is subject to hospitalization by court order.   The statute provides:

> (B) "Mentally ill person subject to hospitalization by court order" means a mentally ill person who, because of the person's illness:
>
> (1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;
>
> (2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;
>
> (3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community; or
>
> (4) Would benefit from treatment in a hospital for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person.

{¶ 28} The term "mental illness" means "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."   R.C. 5122.01(A).

{¶ 29} In order to protect an individual's due-process rights, a trial court must use a "totality of the circumstances" test to determine "whether [an alleged mentally ill- person is subject to hospitalization under R.C. 5122.01(B)."   *In re Burton* (1984), 11 Ohio St.3d 147, 149, 464 N.E.2d 530.   Thus, the factors that a trial court must consider include, but are not limited to:

(1) [W]hether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the laws, rules, regulations and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment.

Id.   Courts are not limited to considering only the foregoing facts, but may also consider all other relevant factors.   See id. at 150.

{¶ 30} Once a trial court concludes that a person is a mentally ill person subject to hospitalization, the court must determine the "'least restrictive place of confinement in consideration of the patient's diagnosis and prognosis, preference of the patient and the projected treatment plan.'"   *Griffin v. Twin Valley Psychiatric Sys.,* Franklin App. No. 02AP-744, 2003-Ohio-7024, ¶ 33, quoting *State v. Williams* (Dec. 21, 1999), Mahoning App. No. 98-CA-1; see also R.C. 5122.15(E).

{¶ 31} In the case at bar, after our review of the evidence adduced at the hearing, we believe that clear and convincing evidence supports the trial court's finding that appellant is a mentally ill person subject to hospitalization.   Dr. Derrico offered substantial testimony concerning appellant's delusion that the government has implanted a chip in his brain and is exercising thought torture.   He testified that appellant suffers from "a substantial disorder of thoughts, schizophrenia paranoid type."   The doctor further explained that appellant has engaged in hunger strikes in an effort to make the government admit that it has placed an implant in his

brain.   Dr. Derrico testified that he believed appellant represents a substantial risk of harm due to his hunger strikes.   Dr. Derrico's testimony established that appellant suffers from a mental illness, in that his delusions about the brain implant constitute a substantial disorder of thought, mood, perception, or orientation that grossly impairs his judgment, behavior, or capacity to recognize reality.   See R.C. 5122.01(A).   Appellant's hunger strikes also represent a substantial risk of physical harm to himself.   See R.C. 5122.01(B)(1).   Thus, the trial court had before it clear and convincing evidence to support its involuntary-commitment decision.

{¶ 32} Accordingly, we reject any argument that the trial court's judgment is against the manifest weight of the evidence.

III

EVIDENTIARY ISSUES

{¶ 33} Appellant's 1st, 3d, 4th, 6th, 12th, 16th, 17th, 18th, 19th, 20th, 22d, and 24th assignments of error all relate to either the admission, quality, or credibility of certain evidence.

{¶ 34} Generally, the admission of evidence is entrusted to a trial court's sound discretion.  See, e.g., *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9; *Smith v. Redecker*, Athens App. No. 08CA33, 2010-Ohio-505, ¶ 44.   Consequently, absent an abuse of that discretion, an appellate court should not overturn a trial court's decision regarding the admissibility of evidence.   See, e.g., *Valentine* at ¶ 9.   A trial court does not abuse its discretion unless the court's decision is unreasonable, unconscionable, or arbitrary.   See, e.g., id.   Moreover, the abuse-of-discretion standard does not permit a reviewing court to substitute its judgment for the trial court's.   See, e.g., id.

{¶ 35} In the case sub judice, we are unable to conclude that any of the trial court's

evidentiary decisions are unreasonable, arbitrary, or unconscionable. Here, the trial court could have rationally determined that the evidence appellee admitted is relevant to the issues at hand or that the evidence appellant proffered is not relevant to the issues at hand.

**{¶ 36}** We next address appellant's arguments relating to the quality or credibility of the evidence. As we already stated, the evidence weight and witnesses' credibility are particularly within a trial court's province. A court reviewing a written record is not well-suited to assess witnesses' credibility. Much may be evident in the parties' manner, demeanor, and characteristics that simply cannot translate to the written record and that only a fact-finder can evaluate. Thus, appellate courts afford the utmost deference to a fact-finder's credibility determinations.

**{¶ 37}** In the case sub judice, nothing in the record suggests that we should not defer to the trial court's credibility assessments. Although appellant claims that the trial court relied upon false testimony, we observe that witness credibility and the weight to be afforded the evidence are matters distinctly reserved to the trial court. Especially here, when appellant's mental state is at issue, we simply cannot review the written record and state that appellant's testimony is more believable than the testimony and evidence that the appellee presented. We therefore reject appellant's arguments that challenge the credibility of the witnesses and the quality of the evidence.

**{¶ 38}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 1st, 3d, 4th, 6th, 12th, 16th, 17th, 18th, 19th, 20th, 22d, and 24th assignments of error.

IV

CONFLICT

{¶ 39} In his second issue, appellant asserts that attorney Hedges did not allow him to explore whether Hedges had a conflict of interest.   We disagree with appellant.

{¶ 40} If we construe this argument as asserting that the trial court deprived appellant of a fair trial by failing to ensure that he had an attorney free of conflict, we observe that the court fully explored appellant's complaint regarding a conflict of interest.   Appellant did not indicate the basis for his claim.   The court also asked attorney Hedges whether he had a conflict.   Hedges stated that he did not.   No information or evidence was adduced to the contrary.

{¶ 41} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 2d assignment of error.

V

TRANSCRIPT "FULL OF ERRORS"

{¶ 42} In his 5th assignment of error, appellant asserts that the transcript is "full of errors."   He complains that the transcript improperly reads, "I have represented myself successfully in numerous environmental cases that have been very successful in reducing solutions."   Appellant states that the last word should be "pollution," not "solutions."   Appellant also contends that the transcript fails to report the correct amount he recovered in a judgment against a law-enforcement agency and that the transcript cites the wrong publisher of one of appellant's books.

{¶ 43} App.R. 9(E) sets forth the procedure a party must use in order to correct alleged inaccuracies in the record.   The rule states:

> If any difference arises as to whether the record truly discloses what
> occurred in the trial court, the difference shall be submitted to and settled by that

court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals.

{¶ 44} Appellant did not submit any of the alleged inaccuracies to the trial court. We will not consider them in the first instance. Moreover, none of these alleged errors could have had any possible effect on the trial court's judgment. These alleged errors are of such a nature that any information or facts not accurately portrayed did not have any bearing whatsoever on the issues at hand.

{¶ 45} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 5th assignment of error.

VI

LIMITATION OF TESTIMONY

{¶ 46} In his 7th assignment of error, appellant asserts that the trial court abused its discretion by limiting his questioning of Dr. Derrico to 15 minutes and by limiting his own testimony.

{¶ 47} "'The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion.'" *State v. Treesh* (2001), 90 Ohio St.3d 460, 480-481, 739 N.E.2d 749, quoting *State v. Acre* (1983), 6 Ohio St.3d 140, 145, 6 OBR 197, 451 N.E.2d 802. An abuse of discretion means more than an error of

judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. See, e.g., *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

**{¶ 48}** A trial court "may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation." *Treesh*, 90 Ohio St.3d at 480. Additionally, a trial court possesses discretion to impose a reasonable time limit on cross-examination. See *Knowlton v. Schultz*, 179 Ohio App.3d 497, 2008-Ohio-5984, 902 N.E.2d 548, ¶ 28; *Mathewson v. Mathewson*, Greene App. No. 05CA035, 2007-Ohio-574, ¶ 27 ("Time limitations on evidence have been upheld when a party has not identified what additional evidence the party would have offered or how that evidence could have changed the court's judgment"). Moreover, the trial court has a duty to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to "make the interrogation and presentation effective for the ascertainment of the truth" and to "avoid needless consumption of time." Evid.R. 611(A).

**{¶ 49}** In the case sub judice, the trial court did not abuse its discretion by limiting appellant's pro se questioning of witnesses or by limiting his direct testimony. In fact, the trial court afforded appellant's counsel ample time to examine and cross-examine witnesses regarding relevant facts. The court limited appellant's pro se questioning so as to avoid repetitive testimony, irrelevant testimony, or a needless consumption of time. Thus, we find no abuse of discretion.

**{¶ 50}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 7th assignment of error.

VII

JURY TRIAL

{¶ 51} In his 8th assignment of error, appellant asserts that the trial court erred by denying his request for a jury trial.   We disagree.

{¶ 52} An individual does not possess a constitutional or statutory right to a jury trial during a probate court proceeding involving an involuntary commitment.   Cf. *State ex rel. Kear v. Court of Common Pleas of Lucas Cty., Probate Div.* (1981), 67 Ohio St.2d 189, 191-192, 423 N.E.2d 427 (stating that there is no constitutional or statutory right to a jury trial in a will contest proceeding).   Indeed, R.C. 2101.31 specifically states:

> All questions of fact shall be determined by the probate judge, unless the judge orders those questions of fact to be tried before a jury or refers those questions of fact to a special master commissioner as provided in sections 2101.06 and 2101.07 of the Revised Code.

Moreover, appellant has not pointed to any provision contained in the involuntary-commitment statutes that would entitle him to a jury trial.

{¶ 53} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 8th assignment of error.

VIII

SELF-INCRIMINATION

{¶ 54} In his 9th assignment of error, appellant asserts that the trial court violated his Fifth Amendment right against self-incrimination by informing him that if he testified, he could not invoke his Fifth Amendment rights.   Before appellant testified, the court informed him: "If you testify under oath you cannot invoke your Fifth Amendment.   If you testify either in response to

questions by your attorney or giving a narrative statement then you have to answer questions,

relevant questions that [appellee's attorney] might ask you.   So, you can't invoke your Fifth if

you choose to testify before hand, okay.   I just want you to be aware of that."

{¶ 55} The privilege to refrain from compulsory self-incrimination as guaranteed by the

Fifth Amendment to the Constitution of the United States "'can be claimed in any proceeding, be

it criminal or civil, administrative * * * or adjudicatory * * *.   [I]t protects any disclosures which

the witness may reasonably apprehend could be used in the criminal prosecution or which could

lead to other evidence that might be so used.'"   *In re Gault* (1967), 387 U.S. 1, 47-48, 87 S.Ct.

1428, 18 L.Ed.2d 527, quoting *Murphy v. Waterfront Comm.* (1964), 378 U.S. 52, 94, 84 S.Ct.

1594, 12 L.Ed.2d 678 (White, J., concurring).   The type of proceeding does not determine the

availability of the privilege; rather, it turns upon whether the statement or admission is or may be

inculpatory.   *In re Gault* at 49; *In re Billman* (1993), 92 Ohio App.3d 279, 280-281, 634 N.E.2d

1050.

{¶ 56} In *In re Winstead* (1980), 67 Ohio App.2d 111, 116-117, 425 N.E.2d 943, the court

considered the Fifth Amendment privilege against self-incrimination in the context of an

involuntary-commitment proceeding and held that the privilege does not extend to statements

made in the physician-patient context.   The court explained:

> An involuntary commitment proceeding is denominated as a civil case,
> although, as in a criminal case, the individual's liberty interest is at stake.
> However, the liberty interest is not coextensive with the penal interest.
> Involuntary commitment proceedings are not penal in nature, but humanitarian.   In
> French v. Blackburn (M.D.N.C.1977), 428 F.Supp. 1351, 1354, affirmed (1979),
> 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869, the court stated the following:
>
> " * * * Fundamentally, the state is attempting to temporarily withdraw from
> society those persons whose mental state is such that their presence may pose a

danger to society or to themselves. Secondly, the state is providing treatment to those individuals who may not otherwise have the wisdom or the wherewithal to seek it themselves. * * * "

Therefore, we are faced with a hybrid proceeding involving a possible deprivation of liberty to facilitate treatment for the benefit of the individual and society.

We believe Ohio's statutory framework for judicial hospitalization provides numerous and effective safeguards for the protection of the individual's liberty interest: notice, R.C. 5122.12; pre-hearing medical examination, R.C. 5122.14; probable cause hearing, R.C. 5122.141; full hearing in private proceedings, with subpoena power, right to counsel and right to cross-examination, R.C. 5122.15; as well as, periodic review and right to appeal, R.C. 5122.15(F), (H) and (K).

Upon this framework, the respondent and the Probate Court seek to impose another right the right to silence or privilege against self-incrimination. The Probate Court's judgment order reads, in part, as follows:

"Furthermore, to comport with due process, a person who is alleged to be mentally ill pursuant to Section 5122.11 of the Ohio Revised Code should be told by his counsel and/or his examining physician that he is going to be examined with regard to his mental condition, that the statements he makes may be the basis for civil commitment, and that he does not have to speak to the psychiatrist. This Court does not hold, however, that the individual is entitled to the presence of counsel at such a psychiatric examination."

Under R.C. 5122.15(A)(12), the respondent may testify at the hearing, but "shall not be compelled" to do so, and "shall be so advised by the court." An extension of the privilege against self-incrimination or the right to silence to the physician-patient relationship thwarts the valid objectives and beneficial treatment purposes of the entire judicial hospitalization process. The physician, whether treating or examining, is not an adversary. Silence in no way aids the diagnosis or treatment processes. Evidence gained through examination or treatment is not used against the individual, but rather to aid the court in evaluating alternate treatment plans. The primary source for this evaluation is the patient's revelations to the physician and the physician's opinion therefrom. Therefore, we hold no warning as to a right of silence need be given prior to examination or treatment. The privilege against self-incrimination should not be applied to involuntary treatment or diagnosis procedures to do so would make treatment "unworkable and ineffective."

*French v. Blackburn* [(D.C.N.C.1977), 428 F.Supp. 1351].

{¶ 57} Although *Winstead* may not be directly on point with appellant's argument, we find its general reasoning applicable. As the *Winstead* court notes, an involuntary-commitment proceeding is not penal in nature. Thus, statements that a respondent makes regarding his mental state ordinarily will not lead to criminal prosecution.[2] In the typical case, any self-incrimination that occurs is used to ascertain the respondent's mental state and treatment options, not whether the individual should be subjected to criminal punishment. Moreover, even if we assume for purposes of argument that the trial court improperly compelled appellant to admit that he authored the material on his website,[3] the record contains other substantial evidence to support the trial court's involuntary-commitment decision.

{¶ 58} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 9th assignment of error.

IX

WITNESSES

{¶ 59} In his 10th assignment of error, appellant asserts that the trial court improperly denied his request to call three character witnesses.

{¶ 60} We reject this argument. Appellant has not pointed to the particular point in the record in which he requested to present the character witnesses' testimony, and our own review

---

[2] We have no need to consider in this case how this rule would apply if the respondent did make criminally inculpatory statements in the context of an involuntary-commitment proceeding. Thus, this part of our holding is limited to the facts of this case, i.e., when the statements do not implicate the respondent in a criminal activity.

[3] We observe that appellant makes no argument that the court failed to comply with R.C. 5122.15(A)(12). R.C. 5122.15(A)(12) provides that "[t]he respondent has the right, but shall not be compelled, to testify, and shall be so advised by the court."

fails to show that he requested to present such testimony. Moreover, there is no proffer of the evidence. Evid. R. 103(A) provides:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> * * *
>
> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

The purpose of this rule is to provide reviewing courts with a basis for determining if an alleged error is prejudicial. *State v. Gilmore* (1986), 28 Ohio St.3d 190, 191-192, 503 N.E.2d 147. "Absent a proffer in the trial court and a direct reference in the brief to specific evidence that should have been admitted, we have nothing to rule upon." *In re West* (Dec. 24, 2001), Washington App. No. 01CA8, 2001 WL 1659385, citing App.R. 16(D).

{¶ 61} Within this assignment of error, appellant also asserts that (1) the trial court erred by refusing to allow a reporter to attend the hearing, and (2) the court's use of his "press release" to support its commitment decision violates appellant's First Amendment rights to freedom of speech.

{¶ 62} As to the first of these arguments, appellant has not cited the point in the record in which he requested that a reporter attend the hearing. Moreover, we note that R.C. 5122.15(A)(5) expressly states that involuntary-commitment hearings shall be closed to the public, unless otherwise requested. Again, appellant has not indicated where in the record he requested the reporter's presence. Thus, the trial court did not err by refusing to allow a reporter to attend the hearing.

**{¶ 63}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 10th assignment of error.[4]

X

FAIR TRIAL

**{¶ 64}** In his 11th assignment of error, appellant asserts that he did not receive a fair trial because he was denied access to legal information.   We do not agree.

**{¶ 65}** During the trial court proceeding, appellant had an attorney to represent him who, presumably, had access to legal information.   Appellant was not acting pro se such that he needed independent access to legal information.   Moreover, it appears that the trial court fully complied with the statutory requirements for an involuntary-commitment hearing.

**{¶ 66}** To the extent that appellant asserts that the trial court had a duty to assist him with the filing of a notice of appeal, we observe that appellant timely filed his notice of appeal.  We thus decline to consider whether the trial court should have assisted him.

**{¶ 67}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 11th assignment of error.

XI

CRUEL AND UNUSUAL PUNISHMENT

**{¶ 68}** In his 13th assignment of error, appellant argues that he suffered cruel and unusual punishment because "he was denied access to glaucoma medicine [and] was in the process of going blind during the court hearing."

---

[4]We choose to address appellant's First Amendment argument infra.

{¶ 69} Appellant, however, fails to frame this argument as trial court error. Rather, this complaint appears to be a grievance directed to his treatment providers and thus is beyond the scope of this appeal.

{¶ 70} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 13th assignment of error.

XII

EQUAL PROTECTION

{¶ 71} In his 14th assignment of error, appellant asserts that the trial court's commitment decision violates his right to equal protection under the law. Appellant contends that the proceeding was instituted in retaliation for criticizing the sheriff's office and TCMH.

{¶ 72} The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." As a general rule, "'[a] person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual.'" *Hill v. Croft*, Franklin App. No. 05AP-424, 2005-Ohio-6885, ¶ 16, quoting *Huebschen v. Dept. of Health & Social Servs.* (C.A.7., 1983), 716 F.2d 1167, 1171. "A 'class of one,' however, may appropriately maintain an equal protection claim where the plaintiff alleges both that the state treated the plaintiff differently from others similarly situated and that no rational basis exists for such difference in treatment." *Meyers v. Columbus Civ. Serv. Comm.,* Franklin App. No. 07AP-958, 2008-Ohio-3521, ¶ 18. In an equal-protection claim, government actions that affect suspect classifications or fundamental interests are subject to strict scrutiny by the courts. *Eppley*

*v. Tri-Valley Local School Dist. Bd. of Edn.,* 122 Ohio St.3d 56, 2009-Ohio-1970, 908 N.E.2d 401, ¶ 14. In the absence of a suspect classification or fundamental interest, the state action is subject to a rational-basis test. Id.

**{¶ 73}** In the case at bar, appellant failed to identify how he has been treated differently from others similarly situated. Thus, he has failed to present a cognizable equal-protection claim.

**{¶ 74}** To the extent that appellant's argument may be compared to a selective-prosecution claim,[5] we note that the decision whether to prosecute is generally left to the prosecutor's discretion. See *United States v. Armstrong* (1996), 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687. Thus, similarly, the state's decision to institute an involuntary-commitment proceeding is entitled to discretion, and "there is * * * a 'strong presumption of regularity' in prosecutorial discretion. *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 533, 709 N.E.2d 1148, 1155. A defendant asserting a violation of the right to equal protection because of selective prosecution 'bears a heavy burden.' Id. The right is not violated simply because others similarly situated are not prosecuted for similar conduct. * * * The standard is 'intentional and purposeful discrimination.' *State v. Freeman* (1985), 20 Ohio St.3d 55, 58, 20 OBR 355, 485 N.E.2d 1043." *State v. Norris*, 147 Ohio App.3d 224, 2002-Ohio-1033, 769 N.E.2d 896, ¶ 14.

**{¶ 75}** In the case at bar, appellant did not establish any intentional and purposeful discrimination. Thus, even if the selective-prosecution standard applicable to criminal proceedings applies in the involuntary-commitment context, appellant cannot succeed on such a

---

[5] We will presume for the sake of argument that the criminal selective-prosecution standard may apply in an involuntary-commitment proceeding.

claim.

{¶ 76} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 14th assignment of error.

XIII

DUE PROCESS

{¶ 77} In his 15th assignment of error, appellant contends that the trial court's commitment decision deprives him of due process of law. He reiterates his assertion that the court should have held a jury trial and further asserts that the commitment has deprived him of "an enormous amount of money."

{¶ 78} "The Fourteenth Amendment to the United States Constitution prohibits any state from depriving 'any person of life, liberty, or property, without due process of law.'" *State ex rel. Haylett v. Ohio Bur. of Workers' Comp.* (1999), 87 Ohio St.3d 325, 331, 720 N.E.2d 901. The Ohio Supreme Court has held that R.C. Chapter 5122 complies with due process. See *In re Burton,* 11 Ohio St.3d at 150-151.

{¶ 79} As we have already determined, nothing in the involuntary-commitment statutes entitled appellant to a jury trial. Moreover, appellant has not identified how the trial court failed to comply with the involuntary-commitment statutes, and he has not asserted that the statutes are unconstitutional for failure to provide due process of law. His allegations of financial loss do not, by themselves, demonstrate a denial of due process.

{¶ 80} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 25th assignment of error.

XIV

FOURTH AMENDMENT

**{¶ 81}** In his 21st assignment of error, appellant asserts that the hospital forced him to give blood and urine samples, which were used against him at trial in violation of his Fourth Amendment rights. Appellant, however, does not identify where in the record the trial court considered his blood or urine analysis or where the analyses were admitted into evidence. Furthermore, appellant did not object to any consideration of such evidence, and he did not file a motion in limine. Under these circumstances, appellant clearly waived any alleged error.

**{¶ 82}** Although we are unable to properly review this alleged error, we nevertheless note that in *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, the United States Supreme Court determined that a warrantless seizure of a blood sample for purposes of testing an individual's alcohol level could be justified based on exigent circumstances resulting from the evanescent nature of the evidence, i.e., the fact that the level of alcohol in blood dissipates over time. In so holding, the United States Supreme Court set forth certain criteria to be used in determining if such an intrusion violates the Fourth Amendment: (1) the government must have a "clear indication" that incriminating evidence will be found, (2) there must be a search warrant or exigent circumstances, such as the imminent destruction of evidence, to excuse the warrant requirement, and (3) the method used to extract the evidence must be reasonable and must be performed in a reasonable manner. Id. at 770-772. In the case at bar, one might consider that if appellant was indeed subjected to warrantless blood and urine tests, then under *Schmerber*, such warrantless intrusion may be justified.

**{¶ 83}** Accordingly, based upon the foregoing reasons, we overrule appellant's 21st assignment of error.

XV

FIRST AMENDMENT

**{¶ 84}** In his final assignment of error, appellant asserts that the trial court improperly relied upon his press release when determining whether to involuntarily commit him. He asserts that by doing so, the trial court violated his First Amendment right to free speech and expression.

**{¶ 85}** Initially, we note that appellant waived this argument by failing to raise it in the trial court. *State v. Awan* (1986), 22 Ohio St.3d 120, 489 N.E.2d 277, at syllabus ("Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from the state's orderly procedure, and therefore need not be heard for the first time on appeal"). Second, we point out that even in the absence of appellant's press release, the trial court record in this matter contains more than ample evidence to support the trial court's decision.

**{¶ 86}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's 25th assignment of error and affirm the trial court's judgment.

Judgment affirmed.

HARSHA, P.J., and ABELE, J., concur.

KLINE, concurs in judgment only.

**KLINE**, J., concurring in judgment only.

**{¶ 87}** I respectfully concur in judgment only. Under R.C. 5122.15(J), "Within fourteen

days of the making of an order by a referee, a party may file written objections to the order with the court. The filed objections shall be considered a motion, shall be specific, and shall state their grounds with particularity. Within ten days of the filing of the objections, a judge of the court shall hold a hearing on the objections and may hear and consider any testimony or other evidence relating to the respondent's mental condition. At the conclusion of the hearing, the judge may ratify, rescind, or modify the referee's order."

{¶ 88} Based on a prior, similar version of R.C. 5122.15(J), we held the following: "If appellant anticipates challenging the weight of the evidence or factual findings of a referee on appeal, objections pursuant to R.C. 5122.15(J) and a transcript of proceedings are conditions precedent to raising those issues on appeal. * * * Since appellant failed to file objections to the referee's entry * * *, she has waived consideration of her manifest weight of the evidence argument on appeal." *In re Smith* (Sept. 29, 1993), Athens App. No. 92CA1561, 1993 WL 387029, *4. Here, Kister failed to file objections under R.C. 5122.15(J). Therefore, I would find that Kister has waived his manifest-weight arguments, and I would not address these arguments on appeal.

{¶ 89} Finally, I agree that no plain error exists in the present case. However, in reviewing Kister's remaining arguments, I would use only the plain-error standard of review.

{¶ 90} For the foregoing reasons, I respectfully concur in judgment only.