[Cite as *In re C.J.*, 2019-Ohio-4403.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

IN RE:                                    :

    C.J.                                  :          CASE NO. CA2019-01-013

                            :          O P I N I O N
                                       10/28/2019

                            :

                            :

                            :

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. PD18-10-0047

Michael T. Gmoser, Butler County Prosecuting Attorney, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Kidd & Urling LLC, Thomas W. Kidd, Jr., 8913 Cincinnati-Dayton Road, West Chester, Ohio 45069, for appellant

**HENDRICKSON, P.J.**

{¶ 1}   Appellant, C.J., appeals an order of the Butler County Court of Common Pleas, Probate Division, finding him to be a mentally ill person subject to court order pursuant to R.C. Chapter 5122.  For the reasons set forth below, we affirm.

{¶ 2}   C.J. was referred to Beckett Springs Hospital ("Beckett Springs") by Mercy

Clermont Hospital, where C.J. had voluntarily visited the emergency room two or three times due to insomnia. On October 21, 2018, C.J. was voluntarily admitted to Beckett Springs, which provided him with medication and treatment. Two days later, on October 23, 2018, C.J. requested an "against medical advice discharge" in order to attend a court hearing related to a temporary protection order ("TPO") issued against him. At that time, C.J. was refusing medication and treatment, and Beckett Springs believed C.J. would benefit from staying in an inpatient setting for further assessment and safety purposes. As a result, Beckett Springs issued a hold on C.J.

{¶ 3} On October 26, 2018, Dr. Rakesh Kaneria, a psychiatrist employed at Beckett Springs, submitted an affidavit of mental illness to the probate court. In the affidavit, Dr. Kaneria stated that C.J. was a mentally ill person subject to court order under the criteria set forth in R.C. 5122.01(B)(3) and (4). Dr. Kaneria explained:

> [C.J.] was brought to Beckett Springs voluntarily after presenting to [the emergency department] at Mercy Clermont for 3 consecutive days. [C.J. was] exhibiting increased agitation, paranoia and poor care to ADL's: hygiene, poor sleep, missed one week of work, refusing food and medication. [C.J.] appears in crisis state, as prior to [emergency department] visits he reported he caught his wife having an affair and she took his children from their home. Per [C.J.], his wife is fleeing the country. In his current state [C.J.'s] judgment and insight are impaired and unreliable. He has no identified supports in the area. He has been unwilling to comply with treatment recommendations thus far in his stay at Beckett Springs. He could benefit from IP mood stabilization.

{¶ 4} A magistrate reviewed the affidavit of mental illness and found probable cause to believe that C.J. was a mentally ill person subject to court order. Consequently, the magistrate ordered that C.J. was to be committed at Beckett Springs. The magistrate then scheduled a full hearing for consideration of the affidavit of mental illness.

{¶ 5} The full hearing occurred on October 31, 2018. Dr. Kaneria, C.J., and C.J.'s father testified at the hearing. Dr. Kaneria testified he had a working diagnosis for C.J. of

major depressive disorder. In his opinion, C.J.'s depression was a substantial disorder of mood which impaired his judgment and behavior. Dr. Kaneria's opinions were based upon his observations that C.J. was "having increased stress, * * * difficulty sleeping, difficulty taking care of his basic care. * * * [H]e was having poor concentration, poor appetite, he was increasingly stressed, he was having decreased interest level, and this depression was affecting his day to day life." Dr. Kaneria further explained that C.J.'s failure to take care of himself, inability to sleep, and poor appetite are symptoms of his depression. Additionally, while Dr. Kaneria indicated C.J. exhibited improvement during his time at Beckett Springs, C.J. remained unable to sleep for more than three hours a night, continued to refuse the hospital's food, and generally declined medication.

{¶ 6} Dr. Kaneria further testified that while C.J. was not at a risk of harming himself or others, he was "not quite open about his own feelings." As a result, Beckett Springs was generally concerned about "safety overall[;]" however, according to Dr. Kaneria, the hospital's primary concern was whether C.J. could take care of himself in light of his psychosocial issues. Specifically, C.J. had missed a week of work and visited the emergency room on multiple occasions due to his insomnia. Moreover, immediately prior to C.J.'s voluntary commitment, C.J. had separated from his wife, was served with a TPO, was displaced from his family home, and had moved into a hotel. According to Dr. Kaneria, C.J. was "obsessed" with the TPO and its scheduled hearing, however, his attorney and parents "felt that at that point * * * his level of mental status at that point, he may do better staying in the hospital and miss [the hearing.]" As a result, the hold was placed and C.J. remained at Beckett Springs.

{¶ 7} With regard to C.J.'s progress in treatment at the time of the hearing, Dr. Kaneria testified that C.J. often refused to take his prescribed antidepressants and declined to engage in group counseling with other patients "with a lot of mental health issues." Due to C.J.'s noncompliance with the treatment plan, his discharge plan was difficult to predict at the

time of the hearing. However, Dr. Kaneria concluded that remaining at Beckett Springs and consistently taking the prescribed medication would improve C.J.'s mood and judgment, which would in turn address C.J.'s symptoms of depression. Following any inpatient treatment, Dr. Kaneria further indicated that C.J. would benefit from regular monitoring as an outpatient and from engaging with therapists and psychiatrists to learn how to manage his stress.

{¶ 8} C.J. testified that he has never had any issues with depression and disputes that he now suffers from depression. C.J. indicated he took the antidepressant medications twice while at Beckett Springs but believed neither aided him in addressing his insomnia problem. C.J. further testified that although "major things" were changing in his life at the time of the hearing, including his intention to file for divorce the following week, he did not intend to seek counseling for his depression. Throughout his testimony, C.J. adamantly denied suffering from anything other than insomnia, but indicated he would see a counselor to "actually see if" he suffers from depression as well.

{¶ 9} C.J.'s father testified that he lives in Memphis, Tennessee, but speaks with C.J. regularly. According to C.J.'s father, he was concerned with C.J.'s well-being in the community prior to his commitment at Beckett Springs. Specifically, C.J.'s father was concerned about C.J.'s lack of sleep and the fact that C.J. was residing in a hotel by himself. As a result, C.J.'s father believed it was beneficial for C.J. to talk with someone at Beckett Springs and further indicated he observed C.J. making progress while committed. Despite C.J.'s father's initial response to his son's commitment at Beckett Springs, he also testified that he believed Beckett Springs was detrimental and counter-productive for C.J. and that it had set the "wrong tone" for C.J. to receive the treatment that he needs. According to C.J.'s father, he is in a better position to counsel C.J. and deal with his problems than Beckett Springs. Ultimately, C.J.'s father expressed concern with C.J.'s improvement and indicated

he "really need[s] to have C.J. improve and not * * * have him get to the point where his situation can get worse."

{¶ 10} Based on the evidence submitted, the magistrate found that C.J. was a mentally ill person subject to court order. The magistrate further found that due to C.J.'s mental illness he would benefit from treatment for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person. The magistrate also found that the least restrictive setting available for treatment was inpatient treatment at Beckett Springs, followed by outpatient treatment. In concluding, the magistrate ordered that C.J. be committed to the Butler County Mental Health and Addiction Recovery Services Board for a period not to exceed 90 days and that he comply with the treatment plan developed by those to whom C.J. was committed.

{¶ 11} C.J. objected to the magistrate's decision. In a judgment entered December 10, 2018, the probate court overruled C.J.'s objections and adopted the magistrate's decision. As a result, C.J. was committed at Beckett Springs until December 21, 2018, when he was discharged with an aftercare plan.

{¶ 12} C.J. now appeals, arguing that the probate court erred to the prejudice of C.J. by finding he was a mentally ill person subject to court order pursuant to R.C. 5122.01(B).

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE PROBATE COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF THE RESPONDENT BY FINDING THE RESPONDENT TO BE A MENTALLY ILL PERSON SUBJECT TO COURT ORDER PURSUANT TO R.C. 5122.01(B).

{¶ 15} C.J. argues that clear and convincing evidence did not exist to find that he is a mentally ill person subject to court order. Specifically, C.J. argues the state failed to prove that the totality of the circumstances supports that he is a mentally ill person subject to court

order pursuant to R.C. 5122.01(B)(4).

{¶ 16} R.C. 5122.01(A) defines "mental illness" as a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."  A "mentally ill person subject to court order" means a mentally ill person who, because of the person's illness:

> (1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;
>
> (2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;
>
> (3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community;
>
> (4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person[.]

R.C. 5122.01(B)(1)-(4).

{¶ 17} The state is required to establish that a person is a mentally ill person subject to hospitalization by court order under R.C. 5122.01(B) by clear and convincing evidence. *In re Mowen*, 12th Dist. Clermont No. CA2005-05-040, 2006-Ohio-344, ¶ 30.  Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  In determining whether a person is

subject to court order under R.C. 5122.01(B), a "totality of the circumstances" test should be utilized. *In re Burton*, 11 Ohio St.3d 147 (1984), paragraph one of the syllabus. The factors a court must consider include, but are not limited to:

> [W]hether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the laws, rules, regulations and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment.

*Id.* at 149-50.

{¶ 18} In light of Dr. Kaneria's testimony, the probate court found that C.J.'s inability to acknowledge and treat his mental illness was evidence that his major depressive disorder grossly impairs his judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life. As a result of C.J.'s mental illness, the probate court further held that C.J. would benefit from treatment for his mental illness and needs such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself. With regard to the issue of "grave and imminent risk to substantial rights of others or the person," the probate court found the following:

> The court finds that (1) the existence of the TPO, which when considered with (2) the fact that [C.J.] has a serious mental illness, (3) [C.J.'s] lack of insight into the nature of his illness and the serious nature of that illness, (4) [C.J.'s] refusal to take prescribed medication for the serious mental disorder, which the record indicates is a result of [C.J.'s] faulty reasoning, and (5) the psychiatrist's opinion that [C.J.] could not be safely discharged into the community at the time of the hearing, constitutes clear and convincing evidence of a grave and imminent risk to

substantial rights of others or the person.

{¶ 19} C.J. argues the probate court's findings are not supported by sufficient clear and convincing evidence. Specifically, C.J. argues the record reflects that he was not a risk to others or himself and that he was able to provide for his basic needs.

{¶ 20} Based upon the totality of the record, the testimony of Dr. Kaneria presents clear and convincing evidence to support the probate court's finding that C.J. is a mentally ill person, who, because of his illness, would benefit from treatment and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of himself or others.

{¶ 21} In this matter, C.J. was preliminarily diagnosed with major depressive disorder. According to Dr. Kaneria, C.J.'s depression was a substantial disorder of mood which impaired his judgment and behavior. Despite C.J.'s disagreement with Dr. Kaneria's diagnosis, we find sufficient clear and convincing evidence exists within the record that C.J. has a substantial mental disorder which grossly impairs his judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life. Specifically, the record reflects that at the time of the hearing, C.J. was experiencing a significant amount of stress when considering the pending TPO, inability to see his children, and upcoming divorce proceedings, in addition to moving into a hotel and handling the demands of his employment with the Federal Bureau of Investigation. In response to this stress, C.J. exhibited difficulty sleeping and attending to his basic care, in addition to experiencing poor concentration and poor appetite. The evidence further indicates C.J. exhibited a decreased interest level and was increasingly stressed, which ultimately affected C.J.'s day-to-day life. As the magistrate noted, C.J.'s reaction to the significantly stressful situation he was in at the time of the hearing demonstrates that he is "in the throws of a major depressive disorder."

{¶ 22} We further find that C.J. would benefit from treatment for his mental illness, and

is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or C.J. The record indicates the state originally sought commitment based upon C.J.'s impaired judgment and unreliable insight into reality, which had slightly improved by the time of the hearing, but remained largely unacknowledged by C.J. Despite Dr. Kaneria's and Beckett Springs' legitimate concerns, C.J. continues to dispute Dr. Kaneria's working diagnosis; refused to openly discuss his mental illness; and refused to fully engage in the prescribed treatment plan.

{¶ 23} The behavior demonstrated by C.J. in the record indicates that if C.J. had been discharged at the time of the hearing, his depression and its symptoms would have remained untreated. Specifically, C.J. did not believe the antidepressant medication prescribed by Beckett Springs was necessary or helpful and, despite Dr. Kaneria's preliminary diagnosis, would only agree to see a counselor to determine if he has depression. We find C.J.'s denial of his mental illness particularly concerning in light of his current life demands. The recent separation from his wife and TPO are only the beginning of the divorce proceedings that C.J. indicated were forthcoming. The record reflects that C.J.'s initial response to the increased stress interfered with his ability to care for himself to such a degree that his father grew concerned with his behavior, Mercy Clermont referred him to Beckett Springs, and Beckett Springs issued a hold on his release. Moreover, due to his initial response, C.J. was unable to timely address the TPO proceedings and missed a week of work, which resulted in additional stress and anxiety for C.J. Accordingly, without treatment, we find that C.J.'s behavior significantly interferes with his ability to manage the demands of his day-to-day life and creates a grave and imminent risk to his ability to effectively address the divorce proceedings, pending TPO, and custody issues that are approaching.

{¶ 24} Furthermore, the testimony from C.J.'s father and Dr. Kaneria demonstrates that C.J. needs treatment in order to continue improving and cope with the stressors that will

inevitably arise in the near future. While we acknowledge the stigma that can be associated with being found a "mentally ill person subject to court order," C.J.'s inability to manage the symptoms of his depression would have only continued without intervention by the probate court.

{¶ 25} We review the probate court's fact findings under an abuse of discretion standard. *In re Rudy*, 65 Ohio St. 3d 394, 396 (1992). The record supports the trial court's fact findings, and while close, to find otherwise would be to impose our judgment in place of the trial court's in contravention of the standard of review. Accordingly, we find that C.J.'s ignorance of his mental illness, despite its potential effect on his ability to address the upcoming proceedings, raises concerns for the well-being of C.J. and others. For the foregoing reasons, we overrule C.J.'s assignment of error and affirm the decision of the probate court.

{¶ 26} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.