[Cite as *In re C.G.*, 2023-Ohio-4239.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.G.

Court of Appeals No.  L-23-1007

Trial Court No.  2022 MHC 000250
2022 MHC 000253

**DECISION AND JUDGMENT**

Decided:  November 22, 2023

* * * * *

Carla B. Davis, for appellee.

Alex M. Savickas, for appellant.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} This matter is before the court upon appeal of the judgments of the Lucas County Court of Common Pleas, Probate Division, ordering involuntary commitment for a period of 60 days as the least restrictive alternative consistent with mental health treatment goals, and ordering administration of medications for a period not to exceed 60 days.  For the reasons that follow, we affirm the judgments.

## II. Facts and Procedural History

{¶ 2} Appellant lives with her two daughters, aged 2 years and aged 6 months. On December 5, 2022, appellant called 911, seeking help for herself and her children because she believed a repairman sent by her landlord had contaminated her home with a pool of chemicals that contained LSD. Throughout that day, police officers, rescue personnel, and staff from the Zepf Center, a behavioral health center, came to appellant's home, investigated her claims, and eventually transported appellant to the emergency room, where she was "pink slipped" and referred to St. Charles Hospital for a mental health evaluation. Police took custody of appellant's loaded handgun, and at the hospital, security took possession of a bag of bullets appellant carried with her to the hospital.

{¶ 3} Dr. Rusheeth Thummalapally prepared the affidavit pursuant to R.C. 5122.11 to begin involuntary commitment proceedings, stating appellant was a substantial risk of physical harm to herself and others, including the following narrative:

> Patient is a 28-year-old female with no significant psychiatric history but with history of cannabis use admitted for possible furthering psychosis. Per report EMS was called into her home, by herself, after she was worried that people were spraying her home with chemicals to harm her. Extremely paranoid. When EMS approached her she was making bizarre statements and was asking them to remove poisonous cats from the porch. Per EMS reports patient was living in deplorable conditions with her 2 children in the house. Patient reports that she has been smoking excess cannabis lately.

2.

Patient continues to be extremely paranoid that people are poisoning her food. She was describing at length on how some of the people are sneaking into her room and stealing her socks and placing random things in her room. She continues to make statements that people are trying to poison her environment. Continues to be extremely delusional and paranoid that people are trying to harm her and poison her. Offered her Risperdal however she is very hesitant to try any antipsychotic medications. Patient will need dual commitment to NOPH. NOPH for stabilization and safety due to long term care of needs that may arise.

{¶ 4} Appellant requested drug testing at the hospital, for herself and her children, alleging they were all drugged with LSD by an intruder. Testing revealed appellant was positive for marijuana, and the record does not indicate whether the children were also tested. Appellant admitted to using marijuana, and Dr. Thummalapally, appellant's first treating physician, diagnosed her with acute psychosis with cannabis use a possible exacerbating factor. Dr. Maloney consulted on the case, providing a second opinion regarding medication. Prior to the hearing, Dr. Maloney assumed primary care of appellant after Dr. Thummalapally became unavailable.

{¶ 5} On December 8, 2022, the matter proceeded to hearing. The hearing was bifurcated into the involuntary commitment hearing and the court-ordered medication hearing.

3.

{¶ 6} In the involuntary commitment hearing, the Lucas County Mental Health and Recovery Services Board called Dr. Maloney as its sole witness. The parties stipulated to Dr. Maloney's qualifications prior to his testimony.

{¶ 7} Dr. Maloney testified that appellant was initially under primary care of Dr. Thummalapally, and he had the opportunity to evaluate appellant in order to provide a second opinion. Dr. Maloney testified he met with appellant the morning before the hearing and reviewed the records, which he testified were kept in the ordinary course of hospital business. Based on his review of records and his evaluation of appellant, Dr. Maloney testified that EMS transported appellant "secondary to bizarre behavior" that included "delusional thoughts, thought process, rapid/pressured and tangential speech" Police also confiscated a loaded handgun from appellant, prior to transport, which appellant had in the home she shared with her two young children who were 2 years old and 5 months old. Police reported appellant was "living in dilapidated conditions" and her children were naked, with appellant "very concerned that both she and her children were being drugged by somebody that was coming into the house."

{¶ 8} Dr. Maloney testified that the children were safe "at present time," in the care of Children Protection Services, but the dilapidated condition of the home, combined with appellant having a loaded weapon to defend against "perceived threats" raised concerns. Dr. Maloney could not confirm any threats, but testified:

> I have no investigation that's complete. What I do know is that when
> I spoke to [appellant] about them, and my understanding from family is that

4.

[appellant] has called police out to the house on numerous occasions, there's no one ever there. She spoke with me on a second opinion evaluation stating that this person, at one point that other people couldn't see the person and that the person was throwing like that liquid drug all over their skin and that it was absorbing into their system through the skin. So I don't know that – I couldn't speak to whether or not there's been an individual in the house. I do believe when I spoke with her this morning that there's some reality based potential that somebody from the apartment complex may have been in the house dealing with a mold issue at one point.  * * * [T]here may have been some individual in the apartment building dealing with a mold issue. That's difficult to know whether that was a reality based statement or not but the idea of somebody, that other people couldn't see throwing liquid drugs on her and her children is fairly farfetched.

As to a diagnosis, Dr. Maloney stated:

I think she remains delusional and paranoid. I think she has some thought processes that at times are tangential or disconnected. She can be redirected to linear completion of thought with some effort but it's very easy to go off on tangents. She is of the mindset that she has no mental health problem.

She is – when we were discussing the risk benefits and alternatives to treatment including medications, she was very concerned that medications were chemicals. We kind of talked about how many things are chemicals, that doesn't make them bad, water is a chemical, then it kind of shifted to man-made chemicals and just kind of being adamantly opposed to taking any medication whatsoever.

But at the heart of that was the belief that she does not have a mental health problem and that there's nothing wrong. There does in my opinion appear to be almost a fear of taking medications so it was not able to be demonstrated that there was a rationality behind that other than it being man-made there does seem to be a willingness to experiment with substances in nature such as mushrooms and psychedelics that are natural – naturally occurring, marijuana, as long as they're from a plant occurring naturally in nature. At present time I do not believe that she is still operating in a reality based mindset and I think many of the same risks that were demonstrated on her admission process still exists as she's been untreated and she's not willing to take any medications right now.

{¶ 9} Dr. Maloney added that treatment is critically important for the safety of the children "in terms of neglect of care" as a result of appellant's condition. He also testified that treatment is necessary because appellant poses a risk to others, based on appellant's perception that someone is poisoning her and breaking into her home,

6.

combined with appellant's possession of a loaded gun as a defense to these types of perceived threats.

{¶ 10} Appellant's counsel questioned Dr. Maloney on cross-examination, and Dr. Maloney acknowledged that bizarre behaviors could potentially result from poisoning or drugs. However, he referred to the medical chart, which indicated appellant was positive only for marijuana. Furthermore, Dr. Maloney indicated poisoning or drugs did not "explain the persistence of [appellant's] beliefs" or the rotating, inconsistent story told by appellant over time. Dr. Maloney testified that drugging or intoxication could cause immediate bizarre behavior, "but that would resolve quickly over time" if the issue was merely a substance or poisoning, and that did not happen in appellant's case. Dr. Maloney also acknowledged that appellant was managing in a controlled environment and was not violent or threatening with any staff or other patients, but this did not alleviate his concerns for her ability to care for herself and her children in an uncontrolled environment without proper treatment. Dr. Maloney also stated treatment is necessary to ensure appellant does not lose custody of her children, a possibility if appellant's conditions continue untreated.

{¶ 11} Appellant then testified, after being advised of her right to not testify and waiving that right.

{¶ 12} Appellant testified she posed no risk to herself or others, explaining she asked police to take the loaded gun out of her house, which she kept "in case somebody tries to come in here and rob my home." Appellant argued "it is usually loaded but I

7.

never have it in the top chamber and I always have it either inside my bra or in a lock box or – and I gave [police] the lock box." As to the bullets, appellant explained "I only took the bullets because I didn't want people going in my house and robbing them and having my fingerprints and I asked security to take them at the hospital[.]"

{¶ 13} Regarding events prior to commitment, appellant testified at length, stating in part:

> So what happened when I called EMS was, originally there has been some old problems in my house. Repeatedly I've had to ask maintenance to come in and to solve the problem. So this man comes in my home. He's a tall six foot male, black. He has like kind of a high pitched voice at times. He was wearing a LMHA outfit. I'm not sure he was speaking to someone outside the window, communicating back and forth with the man saying this kind of mold or that.
>
> I've put in several work orders through LMHA which is government, low income where I live and that's how I raise my children by myself with my dog who is a support dog for my heart condition. He's now in canine control waiting for me. I do have two heart conditions. So this man comes in the house, and I asked him to take care of the mold problem upstairs. I said – I remember jokingly saying she's watching you, talking about my child and he laughed a little bit.

8.

I literally ran down the steps, grabbed, I don't know what it was I grabbed at the time, I had to go down the steps for two seconds. I ran right back up the steps. By the time I got upstairs, the guy was already coming around the corner. I looked on the floor, there was a huge puddle and literally my daughter's outfit was soaked. She was wearing – that's why she didn't have clothes on because I took them off and gave them baths. They had diapers on when the police were there.

{¶ 14} After calling paramedics, appellant testified she told police about prior incidents with the man sent to work in her home, including her suspicion the man had been "in my food earlier in the week doing something really odd in my kitchen." Appellant testified she felt the need to watch him and stayed "home for a few days wondering if he was being odd, if he was going to come back." When the repairman returned, appellant suspected he used her toothbrush in his work and then put the toothbrush in her daughter's mouth, stating, "I don't know, but when I came upstairs, my daughter's eyes were the size of golf balls. She couldn't talk."

{¶ 15} Appellant testified that she called for help, believing her children had been drugged, stating:

My children are very intelligent and I take time and I live in poverty to take care of them by myself. I lived on so much to care for my children and this is heartbreaking because the call I made to the EMS and to the

police under cameras and everything, everyone, the entire ecosystem, the workers in every department is off balance.

I make a call, I said hey, my children and I have been drugged, we need help getting to the hospital. They come in and say they look okay, they leave. Did that solve the problem? Did that help us get to the hospital while we were all messed up? They said you look like you're messed up, how about we refer you to the Zepf Center. So the Zepf Center comes by and talks and I go this is not getting better. I make another call and say can you please give us a ride to the hospital, I don't want to drive. I can't get a DUI. I had a DUI when I was 19.

I haven't had one since and I don't want another one and I didn't want to drive or hurt my children in the car so I called back and said please help us get to the hospital. I said we have been drugged and we need tested for LSD. They took us to the hospital. The hospital at St. V.'s didn't test me and my children for LSD. They said oh you're fine, it's just marijuana coming up.

{¶ 16} Appellant then provided detailed testimony regarding her purchase of marijuana in Michigan. She also testified that marijuana was not the problem, but instead, the problem concerned the "LSD that was not tested for," which appellant believed was part of larger issues at the hospital. Appellant testified, "The problem is,

10.

there's a serious lawsuit on [the hospital] across all this because they didn't run the proper tests."

{¶ 17} Appellant's testimony regarding events then returned to her gun, and she addressed her reasons for owning a firearm. Appellant stressed that she willingly surrendered her loaded gun to police. She indicated she "worked hard for" her firearm and purchased it as a tool after "someone shot a gun off outside my house three days before my first daughter was born." Appellant also stated she kept a gun because she has "a fear of water and not being able to get out of the car to shoot the window out, or, let's say someone gets in my car --." Appellant argued she would do whatever was suggested by the court, if only she could obtain immediate release from the hospital. Appellant testified that hospitalization was "not good for my health" and stated, "The food is not proper. I look like I'm dying. I literally was just drugged." Appellant further argued she was not allowed to take medication because of her heart condition, and could take only vitamins, stating medications "break my body down" and "kill me faster."

{¶ 18} The Board's counsel then questioned appellant on cross-examination, limiting questioning to a single question and response as follows:

Q: [D]o you agree with the doctor's diagnosis that you suffer from a mental illness?

A: No, not at all. No, I'm coming down off serious drugs. I was drugged and that is the truth. I was drugged by a man who came in my home and drugged my children, my children. That man is still out there.

That is my point. This is more serious than trying to say some girl is mental because she looks unhealthy.

{¶ 19} At the conclusion of testimony, the Board asked the probate court to adopt the doctor's recommendation for a period of treatment up to 60 days. Appellant's counsel waived closing argument regarding commitment, stating, "I think [appellant's] testimony was sufficient."

{¶ 20} The probate court found by clear and convincing evidence, based on Dr. Maloney's testimony, that appellant was a mentally ill person subject to court order as defined by R.C. 5122.01(B), and ordered a commitment period not to exceed 60 days as the least restrictive alternative available.

{¶ 21} The probate court then convened hearing as to court-ordered medication.

{¶ 22} Again, Dr. Maloney testified as the Board's sole witness. He testified he is the treating psychiatrist for appellant, after taking over the care from Dr. Thummalapally. Dr. Maloney testified he reviewed appellant's lab work as documented in her medical charts and records, kept in the ordinary course of business. He further testified appellant suffers from acute psychosis and is not compliant with the treatment plan, which includes medications. Finally, Dr. Maloney testified that appellant's prognosis was poor without prescribed medications, and with medications, he indicated rated appellant's prognosis as fair.

{¶ 23} The Board's counsel then introduced the medication packet, filed in the case, listing proposed medications. Dr. Maloney testified that the list was not meant to be

12.

administered all at once, but the treatment plan involved using "one medication and titrat[ing] to affect" to determine the most effective medication. Dr. Maloney indicated he discussed the medication with appellant but determined "[s]he lacks capacity based on my assessment from the standpoint of number one, she does not believe that she has a mental illness and therefore she is not able to adequately weigh the actual risks and benefits of compliance with medication versus noncompliance with medication so she's lacking some key elements of capacity." He testified that the benefits of forced medication outweighed the risks to appellant, as stated in the opinion he offered as a second opinion to Dr. Thummalapally's original assessment. The medication packet was admitted without objection.

{¶ 24} On cross-examination, Dr. Maloney testified that appellant had not taken any of the proposed medications, and none of the medications would interfere with or worsen her heart condition, although there were potential side effects that would need monitoring as he administered the medications. He reiterated that he discussed medication with appellant, describing appellant's views as follows:

> Her response was very much originally on the term of chemicals, putting chemicals into her body and then we sort of narrowed that down to manmade chemicals. I can tell you that the risk of many of the substances that [appellant] has ingested of her own freewill, are substantially higher risk than the medications that we're talking about with her underlying medical conditions but there seems to be a delusional belief that any

13.

manmade chemicals are higher risk than those that could be found in nature.

So her response is one of simply an absolute avoidance of any medication that we would have to offer. I try to engage in a discussion with her even using Tylenol as an example as Tylenol is from tree bark as originally discovered in tree bark and how that's a medication now, though it's manmade now and led us down the path of pursuing any medications that came from tree bark. I said I don't have any other medications to offer you for this particular illness that would come from tree bark so it was just kind of very focused on manmade chemicals.

{¶ 25} At the conclusion of Dr. Maloney's testimony, appellant testified, again waiving her right to not testify.

{¶ 26} Appellant outlined her aversion to medications, explaining they were detrimental to her health, stating,

Look at me. Okay. Please, look at me. Look at my face how it's all sunk in. This is what drugs and chemicals have done to me, Okay. This what drugs do to people. Not just regular drugs, street drugs, I'm talking pharmaceutical drugs."

She also disputed Dr. Maloney's view that Tylenol is natural, arguing Tylenol is no longer just from bark, but contains chemicals.  She then testified she would be willing to take CBD pills, which are natural, but the hospital does not offer that option.  Appellant

14.

also offered other options she would be willing to pursue, such as "offering up myself to drug and counseling classes, offering up myself to drug testing as long as you would like," if only the court would release her so she could get her dog back and have Christmas with her children.

{¶ 27} When asked if she had been taking any of the medications described by Dr. Maloney, appellant testified, "No, I am not willing to take any of these medicines." However, her testimony also suggested the hospital had already forced her to take medications. She testified that she was being held against her will "and held down and my body internally shut down." She also testified she has had difficulty going to the bathroom "ever since they put that drug in my system" and the drug "slowed down, internally shut down my insides." Appellant then attributed drugging to the hospital, stating:

> This isn't all from that man, it's from [the hospital]. I was under police cameras too and I said I do not want that and they forced me to take it. He said hold my hand, he made me take it anyway but that still doesn't prove that – they were forcing me to take the medication. They were forcing me – they held me down, they strapped me down, took my children from me, my children were crying in the background, I said you haven't tested us for LSD. My children could leave here and withdraw and die, you did not test us.

{¶ 28} At the conclusion of appellant's testimony, counsel for the Board declined to ask any questions on cross-examination. The probate court then asked appellant about her children and her views on medication for her children. Appellant testified that she administered Tylenol in the past, but would no longer give them medication, believing healthy food, rest, and exercise was sufficient treatment for any ailments, even if a pediatrician advised administering medication.

{¶ 29} Upon consideration of the testimony and evidence, the probate court found appellant lacked capacity to give consent by clear and convincing evidence, and ordered medication for a period not to exceed 60 days. After the court's decision from the bench, appellant voiced her displeasure with that decision, leading to the following exchange with the magistrate:

[Appellant]: I will give them Tylenol if I have to. If you want me to give the children Tylenol, I'll give them Tylenol.

* * *

I'm seriously worried that you guys want me to force people and want people to be forced to take medication and call them mentally ill because they were drugged or they look unhealthy.

The Court: Is there anything else?

[Board Counsel]: No, your honor.

[Appellant's Counsel]: No, your Honor.

[Appellant]: I need another lawyer involved.

16.

The Court: [C.G.], I was going to tell you, if you get a lawyer that comes in and files something I will take a look at it, okay, but you're responsible for finding your own lawyer. The court has appointed you one, okay.

[Appellant]: Okay. So we have court next week again?

The Court: No, I need a lawyer of your choosing to file something and if that happens then we may have court next week. It depends on if you can get a lawyer.

The magistrate's decision included the following language in bold type:

**Pursuant to Sec. 5122.15(J) this order shall take immediate effect. Within fourteen days of the making of an order by a magistrate a party may file written objections to the order with the court.**

{¶ 30} The judge immediately adopted the magistrate's decision, effective December 8, 2022, with the judgment entry including the following language:

Pursuant to Civ. Rule 53(D)(4)[e](i), this Judgment is being made as a permanent order without waiting for timely objections by the parties and shall take immediate effect. If timely objections are filed to the Magistrate's Decision, the objections shall operate as an automatic stay of execution of judgment until further order of this Court.

Neither appellant nor her attorney filed any written objections within fourteen days.

17.

{¶ 31} On January 6, 2023, appellant filed a pro se notice of appeal of the judgments, with a request for appointed counsel, and counsel was appointed for the appeal.

{¶ 32} On February 23, 2023, after noting the failure of trial counsel or appellant to file written objections to the magistrate's decisions, appellate counsel attempted to preserve the issue on appeal by filing a motion for leave to file objections in the probate court. The probate court denied leave on March 2, 2023.

### III. Assignments of Error

{¶ 33} Appellant now appeals the judgment of the probate court, assigning the following as error:

1. The court erred in finding that the Board established that [appellant] was mentally ill by clear and convincing evidence.

    a. Documents [were] not authenticated, witness had no personal knowledge.

    b. The statutory definition of mental illness was not met by the evidence presented.

    c. The court did not properly follow the statute in considering whether [appellant's] involuntary commitment was the least restrictive alternative.

    d. A magistrate cannot issue a judgment entry.

2. The court erred in finding the Board established that [appellant] lacked capacity such that she should be forced to take medication.

18.

{¶ 34} As an initial matter, we note appellant asks this court to consider her attempt to file objections in the trial court, pursuant to Civ.R. 53(D), and address the merits of her assignments of error as if she had preserved the issues for appellate review. However, appellant filed her motion seeking leave to object after she had perfected her appeal to this court. Therefore, the motion seeking leave in the probate court sought relief after that court was divested of jurisdiction to proceed. The law is settled regarding a trial court's jurisdiction over a matter, once appealed. "[O]nce an appeal is perfected, the trial court is divested of jurisdiction over matters that are inconsistent with the reviewing court's jurisdiction to reverse, modify, or affirm the judgment." *State ex rel. Rock v. School Emp. Retirement Bd.,* 96 Ohio St.3d 206, 2002-Ohio-3957, 772 N.E.2d 1197, ¶ 8.

{¶ 35} Appellant acknowledges that her trial counsel failed to file objections to the magistrate's decision. Even so, she raises substantive challenges to the magistrate's findings as to both commitment and medication, and further argues a procedural error, asserting the judgment was improper because a magistrate, rather than the judge of the probate court, entered judgment.

{¶ 36} For ease of discussion, we address the assignments of error out of order.

**A. Magistrates may preside over hearings and enter decisions pursuant to R.C. 5122.15(J).**

{¶ 37} In the fourth issue contained within appellant's first assignment of error, she argues a magistrate may not enter judgment. Although the magistrate's decision was

19.

captioned as a "judgment entry," appellant's procedural challenge misstates the record in this case, as the judge of the probate court entered judgment, adopting the magistrate's decision. To the extent that the magistrate presided over the matter, moreover, we find appellant's argument without merit as both Civ.R. 53 and R.C. 5122.15 permit a magistrate to preside over hearing and prepare a written decision in the proceedings. *See State ex rel. Franks v. Ohio Adult Parole Auth.,* 159 Ohio St.3d 435, 2020-Ohio-711, 151 N.E.3d 606, ¶ 9, citing Civ.R. 53(A) and (C)(1); R.C. 5122.15(J) and (K). Both Civ.R. 53 and R.C. 5122.15, moreover, provide for written objections to challenge the magistrate's factual findings. *See* Civ.R. 53(D)(3)(a)(i) and (iii); R.C. 5122.15(J).

{¶ 38} In addition to the authority granted to a magistrate to preside over hearing, the magistrate had authority and was required to put the decision in writing, with that decision to have immediate effect. R.C. 5122.15(J) expressly provides:

> A referee appointed by the court may make all orders that a judge may make under this section and sections 5122.11 and 5122.141 of the Revised Code, except an order of contempt of court. The orders of a referee take effect immediately. Within fourteen days of the making of an order by a referee, a party may file written objections to the order with the court. The filed objections shall be considered a motion, shall be specific, and shall state their grounds with particularity. Within ten days of the filing of the objections, a judge of the court shall hold a hearing on the objections and may hear and consider any testimony or other evidence relating to the

20.

respondent's mental condition. At the conclusion of the hearing, the judge

may ratify, rescind, or modify the referee's order.

R.C. 5122.15(J). Thus, the decision entered by the magistrate, and adopted by the judge

of the probate court, was not defective. Furthermore, the magistrate properly addressed

the requirement for written objections with appellant at the end of her hearing, in order to

merit further review and possible hearing on any objections, and included the same notice

within the written entry.

{¶ 39} Therefore, because R.C. 5122.15(J) permitted the magistrate to hear the

matter and enter a written decision, and the judge immediately adopted that decision in a

judgment entry, we find no merit in appellant's argument regarding the fourth issue

raised within the first assignment of error.

**B. Appellant waived all but plain error on appeal.**

{¶ 40} As to appellant's substantive challenges to the probate court judgments, she

waived all but plain error review on appeal by failing to file written objections within the

time permitted by Civ.R. 53(D) and R.C. 5122.15(J). (Citations omitted) *Franks* at ¶ 9;

*see also In re Kister,* 194 Ohio App.3d 270, 2011-Ohio-2678, 955 N.E.2d 1029 (4th

Dist.), ¶ 19. The parties do not address whether the criminal or civil plain error standard

applies, but the statute governing commitment provides for application of the Civil Rules

of Procedure "to the extent they are not inconsistent" with the statute. *In re Kister,* at ¶

19, fn 1, citing R.C. 5122.15(A)(15).

21.

Although in criminal cases "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court," Crim.R. 52(B), no analogous provision exists in the Rules of Civil Procedure. The plain error doctrine originated as a criminal law concept. In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings.

(Citations omitted) *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997).

{¶ 41} The Board addressed the matter under the criminal plain error standard, arguing that there was no obvious error that affected the outcome of the proceedings, requiring reversal to correct a manifest miscarriage of justice. Appellant did not address plain error at all in argument, but merely asserted plain error required reversal.

{¶ 42} In addressing plain error on appeal, we may only reverse in "exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * *." *In re Alyssa C.,* 153 Ohio App.3d 10, 2003-Ohio-2673, 790 N.E.2d 803, ¶ 35 (6th Dist.),

22.

quoting *Goldfuss* at 122-123. Thus, even if "we see significant difficulties in the evidence supporting many of the magistrate's findings and conclusions," such difficulties do not automatically rise to the level of plain error. *In re Alyssa C.* at ¶ 36. To demonstrate plain error, appellant must identify "(1) a deviation from a legal rule, (2) that the error was obvious, and (3) that the error affected the basic fairness, integrity, or public reputation of the judicial process and therefore challenged the legitimacy of the underlying judicial process." *State v. Morgan,* 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784, ¶ 41, citing *Goldfuss* at 121.

### 1. Dr. Maloney had personal knowledge as one of the treating physicians, testifying to records he identified as kept in the ordinary course of hospital business.

{¶ 43} In the first issue raised within her first assignment of error, appellant argues that Dr. Maloney lacked personal knowledge, necessary for testifying, and that the exhibits were not properly authenticated. As to Dr. Maloney's personal knowledge, appellant appears to argue that Dr. Maloney must create the entire medical record or participate in treatment as the primary physician for the entirety of the care in order to possess the requisite personal knowledge necessary to authenticate the records and provide testimony, but cites to no authority in support of this proposition. As Dr. Maloney either consulted or provided primary care during the period leading up to the hearing, we find no error based on a lack of personal knowledge. We also find no error regarding authentication of exhibits, admitted at the hearing.

23.

{¶ 44} Authentication of evidence is governed by Evid.R. 901, and requires the proponent of the evidence to demonstrate "that the matter in question is what its proponent claims." Evid.R. 901(A). Appellant raised no objection to admission in the probate court, limiting our review to a plain error analysis. As previously noted, appellant must demonstrate obvious error, relative to authentication, and plain error applies in only "exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process[.]" *In re Alyssa C.* at ¶ 35, quoting *Goldfuss* at 122-123.

{¶ 45} In challenging authentication, appellant does not argue her medical records were not the same records kept by the hospital in the ordinary course of business. She also does not address Dr. Maloney's testimony, indicating his familiarity with the records based on his initial consultation and later treatment of appellant. The requirement of authentication under Evid.R. 901(A), furthermore, requires only a prima facie showing of authenticity, and "is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility." (Citation omitted) *State v. Gibson,* 6th Dist. Lucas Nos. L-13-1223, L-13-1222, 2015-Ohio-1679, ¶ 45.

{¶ 46} The threshold for authentication is very low, and "reflects an orientation of the rules toward favoring the admission of evidence." *State v. Giles,* 6th Dist. Lucas No. L-20-1075, 2021-Ohio-2865, ¶ 31, quoting *State v. Jones,* 6th Dist. Lucas No. L-05-1232, 2007-Ohio-563, ¶ 54. The standard for admission, moreover, "does not require

24.

conclusive proof of authenticity." *Giles* at ¶ 31, quoting *State v. Jaros,* 6th Dist. Lucas No. L-10-1011, 2011-Ohio-5037, ¶ 15.

{¶ 47} Here, Dr. Maloney identified the records as those kept by the hospital in the ordinary course of business. Dr. Maloney testified regarding his participation in appellant's care, first in offering a second opinion, and later, in assuming her primary care. He also testified regarding his review of the record, which he referenced as part of his testimony. The requirement for authenticity addresses identity, or that the document is what the proponent claims. Evid.R. 901(A).

{¶ 48} Considering the record in this case, we find no obvious error in the admission of documents based on authentication. Appellant, furthermore, fails to demonstrate this is the exceptional case, requiring reversal for plain error based on admission of documents. We therefore find no merit to appellant's argument regarding the first issue, raised within the first assignment of error.

### 2. The probate court did not err in finding appellant was a person with a mental illness subject to court order, based on the statutory definition.

{¶ 49} In the second issue raised within her first assignment of error, appellant argues the "factual basis for whether [she] met the definitions of mental illness did not reach the clear and convincing standard, under any of the three (3) possible categories alleged in the affidavit of mental illness[.]" In challenging the magistrate's factual findings on the issue, appellant argues the evidence did not satisfy the requirement of clear and convincing evidence because the testimony could have been construed

25.

differently, in appellant's favor. Thus, appellant primarily challenges the magistrate's findings of fact, as adopted by the judge, without first asserting objections to the findings in the probate court.

{¶ 50} Appellant's failure to object to the magistrate's findings prevent review of the findings on appeal. (Citations omitted) *In re Estate of Stotz v. Stotz,* 6th Dist. Sandusky No. S-22-014, 2023-Ohio-663, ¶ 19. Therefore, appellant must demonstrate that the probate court deviated from a legal rule or committed an obvious error, affecting the integrity of the proceedings. *In re Estate of Stotz* at ¶ 20.

{¶ 51} "It is well recognized that an involuntary civil commitment constitutes a significant deprivation of liberty requiring due-process protection." *In re Miller,* 63 Ohio St.3d 99, 101, 464 N.E.2d 530 (1992), citing *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *In re Burton*, 11 Ohio St.3d 147, 151, 464 N.E.2d 530 (1984). Therefore, courts must follow the specific procedures set forth in R.C. Chapter 5122 to ensure a "patient's due-process rights receive adequate protection." *Id.*

{¶ 52} For purposes of hospitalization, the law first defines a mental illness as a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A). To determine a person is mentally ill and subject to court order, the probate court must find at least one subsection under R.C. 5122.01(B) applies, which lists "categories of adverse consequences that a person's mental illness is

26.

likely to engender." *State v. Shepard,* 13 Ohio App.3d 389, 392-393, 469 N.E.2d 1040 (6th Dist.1984).

{¶ 53} Appellant challenges the evidence demonstrating the Board satisfied the definition of a mentally ill person "subject to court order," within the meaning of R.C. 5122.01(B).  The statutory definition provides, in pertinent part:

(B) "Person with a mental illness subject to court order" means a person with a mental illness who, because of the person's illness:

(1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

* * *

(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community;

(4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person;

27.

{¶ 54} In making a determination whether a person is a "mentally ill person" under the statute, courts apply a "totality of the circumstances" test, balancing "the individual's right against involuntary confinement in deprivation of his [or her] liberty, and the state's interest in committing the emotionally disturbed." *In re Burton* at 149.[1] While the statute grants courts broad discretion to consider an individual's history in determining the present mental condition, some factors for consideration, set forth in *Burton,* include the risk of physical harm to self or others, the medical testimony regarding the present condition of the person, whether the person has insight into their condition so that they will avail themselves of treatment, the grounds for commitment stated in the affidavit, and any past history that indicates the person's potential compliance with treatment. *Burton* at 149-150.

{¶ 55} In his affidavit of illness, initiating the proceeding, Dr. Thummalapally specified that appellant met the definition of a mentally ill person based on R.C. 5122.01(B)(1), (3), and (4). At hearing, Dr. Maloney testified regarding factors under R.C. 5122.01(B)(3) and (4), demonstrating appellant was not providing for her basic

---

[1] While *Burton* construed a former version of R.C. 5122.01, using the phrase "mentally ill person subject to hospitalization," and the new version uses the phrase "mentally ill person subject to court order" and adds an additional provision under R.C. 5122.01(B)(5), other jurisdictions continue to apply the totality of the circumstances test articulated in *Burton*, finding the analysis instructive. *See, e.g., State v. McNichols,* 2020-Ohio-2705, 154 N.E.3d 125, ¶ 16 (4th Dist.), citing *In re C.J.,* 12th Dist. Butler No. CA2019-01-013, 2019-Ohio-4403, ¶ 19; *In re R.T.,* 10th Dist. Franklin No. 17AP-288, 2019-Ohio-618, ¶ 13 (additional citation omitted). *See also State v. Sims,* 2022-Ohio-3365, 197 N.E.3d 14, ¶ 47 (3d Dist.); *State v. Weaver,* 9th Dist. Medina No. 17CA0092-M, 2018-Ohio-2998, ¶ 44.

28.

physical needs and exhibited behavior that created a grave and imminent risk to substantial rights of others or herself.

{¶ 56} Dr. Maloney testified that appellant suffered from acute psychosis, a substantial disorder of thought, and without treatment, her prognosis was poor. Dr. Maloney also noted that appellant was behaving bizarrely, and police found her living in "dilapidated conditions" with a loaded handgun to defend against perceived threats. He indicated treatment was critically important "not just for the safety of the children but also so that [appellant] can remain in custody of the children and hopefully be a mother to the children," with loss of custody reasonably possible should appellant's condition remain untreated. Dr. Maloney further noted that, in addressing the risks and benefits of the proposed treatment, appellant resisted medications in favor of "natural" substances like marijuana and – more significantly – she maintained the belief that there was nothing wrong and that she did not have a mental health problem.

{¶ 57} Upon consideration of the evidence, the probate court found appellant met the definition of a mentally ill person subject to court order as defined by R.C. 5122.01(B), without specifying a subsection. Appellant challenges this conclusion, not based on the probate court's application of the law to the facts, but based on disagreement with the factual findings. In doing so, appellant argues her own interpretation of the facts.

{¶ 58} Appellant suggests the probate court misidentified the issue, failing to see she was just a parent seeking medical care for her children, with the hospital failing to provide that care. Appellant explains her tangential speech and delusional behavior as

29.

arising, in part, from her distress over the poisoning of her children, arguing the hospital failed to conduct any testing of her children. However, appellant cites to no evidence in the record supporting this conclusion, with the record silent as to whether the hospital administered any tests to her children. The only evidence of drug testing indicated appellant's own drug screen, which identified only marijuana use. Additionally, as to the firearm, appellant argues she kept it locked away, ignoring her own testimony that she also carried it on her person, and police confiscated the gun from her at a time she exhibited signs of delusion and paranoia.[2]

{¶ 59} While the probate court did not specifically identify a subsection under R.C. 5122.01(B), appellant does not dispute the underlying facts, merely offering a different interpretation of those facts. Furthermore, the statutory definition is met by demonstrating satisfaction with at least one of the categories in subsections (B)(1) – (4). *In re Boggs,* 50 Ohio St.3d 217, 219, 553 N.E.2d 676 (1990). Considering the facts in this case, we note that similar facts have been deemed sufficient as competent credible evidence supporting involuntary commitment.

{¶ 60} For example, in *In re K.W.,* the Tenth District Court of Appeals considered commitment appropriate pursuant to R.C. 5122.01(B)(3), where the person exhibited delusional behavior and, as a result of her delusions, refused to eat because she believed

---

[2] As to the circumstances in which police took custody of the firearm and ammunition, only appellant supplied the detail of voluntary surrender of a gun kept inside a locked box. As the circumstances involved in securing the firearm are not dispositive of the issues on appeal, and appellant did not object to the magistrate's decision based on the factual distinction of voluntary surrender, we need not address this as an issue on appeal.

her food was being poisoned and caused rashes on her body. *In re K.W.,* 10th Dist. Franklin No. 06AP-731, 2006-Ohio-4908, ¶ 18. Likewise, in *Matter of A.C.,* the Tenth District affirmed the probate court's finding under R.C. 5122.01(B)(4), where the person subject to hospitalization exhibited signs of paranoia and delusion, and lacked insight into her condition, denying she suffered from mental illness. *In Matter of A.C.,* 10th Dist. Franklin No. 20AP-82, 2021-Ohio-2116, ¶ 33. This Court has also affirmed hospitalization, pursuant to R.C. 5122.01(B)(4), based on evidence that a person is susceptible to using illicit drugs instead of prescribed medications, deemed evidence of a lack of insight and resistance to complying with a treatment plan. *State v. Dail,* 6th Dist. Lucas No. L-87-060, 1987 WL 20433 (Nov. 27, 1987), *2-3, citing *In re Burton,* 11 Ohio St.3d at 149-150, 464 N.E.2d 530.

{¶ 61} Considering this record, and based on application of the law to similar facts, appellant fails to demonstrate that the probate court deviated from the statute in finding appellant was a mentally ill person subject to court order. Instead, appellant's argument raises different conclusions that might be drawn from the evidence adduced at hearing. Although the record is limited to the affidavit, the medical records, the testimony by Dr. Maloney, and the testimony of appellant herself, appellant does not address any specific deficiency in the evidence, demonstrating plain error in the probate court's application of the statute in determining appellant was a "mentally ill person subject to court order." Thus, based on the record, we find no deviation from the law or obvious error, and appellant failed to demonstrate plain error in the proceedings

31.

regarding the probate court's determination that she met the definition of a "mentally ill person subject to court order."

### 3. The probate court made a specific finding that involuntary commitment was the least restrictive alternative.

{¶ 62} Appellant next argues, relative to the third issue raised within her first assignment of error, that the probate court did not properly follow the statute in considering whether her involuntary commitment was the least restrictive alternative. In support, appellant acknowledges Dr. Maloney's testimony, that he believed a 60-day inpatient stay was the least restrictive alternative. However, appellant argues that, because Dr. Maloney did not identify or "fully explain" other alternatives to commitment, the probate court failed to consider and weigh "at least two options." Appellant cites no authority supporting an "at least two options" requirement.

{¶ 63} Pursuant to R.C. 5122.15(E), the probate court shall only impose "the least restrictive alternative *available and consistent with treatment goals*" after considering the following factors, prior to ordering commitment:

(1) The respondent's diagnosis and prognosis made by a psychiatrist, licensed clinical psychologist, clinical nurse specialist who is certified as a psychiatric-mental health clinical nurse specialist by the American nurses credentialing center, or certified nurse practitioner who is certified as a psychiatric-mental health nurse practitioner by the American nurses credentialing center;

32.

(2) The respondent's preferences;

(3) The respondent's projected treatment plan. R.C. 5122.15(E)

(emphasis added.).

Thus, the statute required the probate court to weigh appellant's diagnosis and prognosis, appellant's preferences, and the treatment plan in selecting the least restrictive alternative that was available and consistent with treatment. There is no provision within the statute requiring a court to select from at least two possible alternatives without reference to whether those alternatives are available and consistent with treatment, as argued by appellant. The only specific requirement, mandated by the statute, is as follows:

If the court determines that the least restrictive alternative available that is consistent with treatment goals is inpatient hospitalization, the court's order shall so state. R.C. 5122.15(E).

{¶ 64} In this case, the probate court heard the argument of appellant, advocating for counseling and drug testing instead of in-patient treatment. The court also heard appellant's testimony, expressing an aversion to all medications listed in her treatment plan in favor of "natural" medicines like CBD and rejecting Dr. Maloney's diagnosis of mental illness. The probate court considered appellant's preferences but found hospitalization appropriate. The court, furthermore, stated in its entry that hospitalization was the least restrictive alternative available that is consistent with treatment goals, as required by R.C. 5122.15(E). The statute required nothing more. Additionally, appellant

33.

waived any challenge to the court's findings, based on her failure to assert a timely objection in the trial court.

{¶ 65} We therefore find that the probate court complied with the statute in determining the least restrictive alternative and, therefore, we find the third issue raised within appellant's first assignment without merit. Having addressed each of the issues raised within appellant's first assignment of error, and finding each without merit, we find appellant's first assignment of error not well-taken.

### 4. The record demonstrated appellant lacked capacity, such that the probate court properly ordered medication.

{¶ 66} In her second assignment of error, appellant argues that the probate court's determination for court-ordered medication rested on a "tenuous proposition" that she "lacked capacity to consent because she denied having a mental illness." Specifically, appellant argues that medications were addressed by Dr. Maloney prior to her testimony in the involuntary commitment portion of the hearings, or before any adjudication of mental illness. Additionally, appellant argues her refusal to take medications concerned only those medications prescribed by Dr. Maloney, which she knew would not work well with her heart condition, and she offered less intrusive alternatives, such as surrendering her firearm, attending counseling, and submitting to testing for illicit drugs. As with appellant's first assignment of error, appellant again seeks to challenge the factual findings and conclusions of the probate court, despite having waived all but plain error.

34.

**{¶ 67}** "The right to refuse medical treatment is a fundamental right in our country, where personal security, bodily integrity, and autonomy are cherished liberties." *Steele v. Hamilton Cty. Community Mental Health Bd.*, 90 Ohio St.3d 176, 180, 736 N.E.2d 10 (2000). However, that right is not absolute and must yield "when outweighed by a compelling government interest." *Id.* at 181, citing *Cruzan v. Dir., Mo. Dept. of Health,* 497 U.S. 261, 278-279, 110 S.Ct. 2841, 111 L.Ed.2d 223 (1990); *State v. Williams,* 88 Ohio St.3d 513, 523, 728 N.E.2d 342 (2000).

**{¶ 68}** With this liberty interest in mind, courts recognize a compelling government interest to permit physicians to administer antipsychotic medication to an involuntarily committed mentally ill patient who poses an imminent threat of harm to self or others. *Id.* at 183-184. An additional state interest recognized by courts permits forced medication when the patient lacks capacity to make an informed decision regarding their treatment. *Id.* at 185. This case involves the lack of capacity to make an informed decision, and not an imminent threat of self-harm or harm to others.

**{¶ 69}** The determination regarding court-ordered medication is separate from the determination for involuntary commitment, as "a court's determination that a person is mentally ill and subject to involuntary commitment in a hospital is not equivalent to a finding that the person is incompetent." (citations omitted) *Steele,* 90 Ohio St.3d at 186, 736 N.E.2d 10. Moreover, the fact that the probate court found hospitalization was the least restrictive alternative and ordered commitment "does not even raise a presumption" of incompetence for purposes of court-ordered medication. *Id.* at 187, citing *In re Milton,*

35.

29 Ohio St.3d 20, 22-23, 505 N.E.2d 255 (1987). Before ordering medication, a probate court must find, by clear and convincing evidence, that a patient "lacks the capacity to give or withhold informed consent regarding treatment." *Id.* at 187.

{¶ 70} Appellant challenges the probate court's factual determination regarding court-ordered medication, arguing an alternative interpretation of the evidence adduced at hearing. Significantly, she does not dispute her own testimony that corroborated Dr. Maloney's medical opinion, supporting her inability to give informed consent. Appellant refused to acknowledge she had any mental illness, and rejected any pharmaceutical prescribed by Dr. Maloney in favor of "natural" alternatives, which Dr. Maloney testified would present greater risk to appellant than prescribed medications. Appellant's position was also inconsistent, advocating for marijuana as medication while also expressing a willingness to submit to drug screens.

{¶ 71} Contrary to appellant's characterization of the evidence, Dr. Maloney provided separate testimony in the second hearing addressing court-ordered medication. In that hearing, Dr. Maloney provided testimony demonstrating (1) that appellant lacked capacity to give or withhold informed consent regarding her treatment based on her lack of appreciation of her serious condition and ability to weigh the risks and benefits of treatment versus non-treatment, (2) that taking medication was in appellant's best interest considering her diagnosis, (3) and that there was no less intrusive treatment as effective in treating appellant's mental illness. *See Steele* at paragraph six of the syllabus. Based on this record, Dr. Maloney's testimony presented clear and convincing evidence,

36.

supporting the probate court's decision to order medication for a period not to exceed 60 days.

{¶ 72} Therefore, upon consideration of the record, we find no obvious error by the probate court, relative to the decision for court-ordered medication. Appellant's second assignment of error, therefore, is not well-taken.

## IV. Conclusion

{¶ 73} For the reasons set forth above, we affirm the judgment of the Lucas County Court of Common Pleas, Probate Division. Appellant is ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.              _____
                                               JUDGE
Gene A. Zmuda, J.            

                                   _____
Charles E. Sulek, J.                             JUDGE
CONCUR.

                                   _____
                                             JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.